Edward J. Greenfield, J.
One of the most celebrated trials of our literature was the confrontation of Portia and Shylock as they struggled with the problem of the removal of a pound of flesh. Now, once again, the removal of a pound of flesh, or more properly several pounds, has created a weighty legal problem for resolution by the court.
The hopes, despairs, and conflicts of our time, and ultimately every crisis, custom and social neurosis find reflection in the matters brought before the courts, the great mirror of our society. While not of the same magnitude as wars, depressions or the disasters of nature, the problem of obesity has persistently troubled part of mankind, but even more of womankind, ever since man first eked out more than the marginal subsistence required for bare survival, accumulated the luxury of a surplus food supply, and began to live to eat instead of eating to live.
With the plumb and fleshy females portrayed by Rubens no longer in vogue, having been supplanted by the ideal of the lithe and willowy high-cheekboned model, the plight of these women whose rotundity does not conform to the ideal has been accentuated. The plaintive cry
“O! that this too too solid flesh would melt Thaw and resolve itself into a dew ”
is re-echoed today by the plumb and portly, and has evoked a burgeoning and varied response from Elizabeth Arden, reducing pills, milk farms, steam baths and slenderizers to No-Gal and the Drinking Man’s Diet.
Grace, felicity and beauty are qualities ardently sought after; but, aesthetic considerations aside, excess avoirdupois also creates problems of health, vigor, longevity, hygiene and a general state of well-being that call for the arts of the medical practitioner. Obesity is definitely a medical problem. The correlation *1039 between overweight and a shortened life-span has been amply demonstrated. What a challenge to a medical Michelangelo, to liberate from beneath mountains of flesh the slender, sylphlike creature yearning to be free!
Doctor John J. Bookman was one who rose to the challenge. Among his patients was Jane Zorek, the wife of the defendant and third-party plaintiff in this action. Mrs. Zorek was 5 feet 2 inches, but could not exactly be described as petite, for she had weighed well over 200 pounds. The doctor had been treating her for a number of medical problems arising from her obesity- — -including abscesses, cysts, and skin grafts. In 1962, when this had caused sebaceous gland trouble, he had her hospitalized. In the hospital she was put on a rigid reducing diet restricted to 800 calorics a day and lost seven and one-half pounds. The third-party defendant, Associated Hospital Service of Hew York, with whom Mr. Zorek had a family Blue Cross contract, on that occasion paid the expenses of Mrs. Zorek’s hospital stay without a murmur of protest.
Out of the hospital, Mrs. Zorek was unable to maintain her weight loss, and was plagued by recurring boils and cysts. Hence, in May of 1963, Doctor Bookman again concluded that hospitalization was required and had her admitted to the plaintiff Mount Sinai Hospital. This time she was put on what is known as the ‘1 Duncan Begimc ” — a rigid starvation diet, in which the patient receives no calories at all, only fluids, vitamins and minerals. During her three weeks’ stay in the hospital on this stringent program, Mrs. Zorek lost 17% pounds without adverse effects.
When pressed by the hospital for payment, Mr. Zorek looked to his Blue Cross policy with Associated Hospital Service of Hew York for reimbursement. AHS, however, this time refused payment, contending that obesity was not within the coverage of the contract, and that Mrs. Zorek’s hospital confinement was not necessary for treatment of her condition. This lawsuit then followed.
While on the trial AHS argued that obesity is neither a disease nor an injury, it is clear that Blue Cross coverage is not limited only to those calamities. Since the policy spells out the ‘‘ condition, disease, ailment or accidental injury ’ ’ which is excluded from coverage, it should be plain that there is coverage for hospitalization resulting from any condition, disease, injury or ailment which is not excluded. While it is debatable whether or not obesity is an illness or ailment, certainly it is a “ condition”, and the test of coverage must be determined on other grounds.
*1040 The policy provides: “ Such Hospital Service shall be available to a Subscriber, following his admission to a hospital and during the time he is confined herein as a registered bed patient and while he is under the treatment of a physician, when such hospital confinement is necessary for his proper treatment * * * However, there shall be available only such items of Hospital Service as are necessary and consistent with the diagnosis and treatment of the condition for which such hospitalization is required. (Italics supplied.)
Under Exclusions appear the following: “A. Hospital Service Shall Not Be Provided: * * * 5. For a hospital stay or that portion of a hospital stay which is primarily for custodial, convalescent or sanitarium type care or for a rest cure ”.
AHS, the third-party defendant, argues that hospital confinement was not necessary for proper treatment of Mrs. Zorek’s obese condition, and that the care rendered to her during her stay in the hospital was convalescent or sanitarium type care which the contract excludes.
AHS has continually reiterated that it does not cover a “ confinement for obesity”. The test of coverage, however, is not what condition or disease caused the hospitalization, but whether “ confinement is necessary for proper treatment ”. No condition could be more serious than a suspected cancer, but if confinement in a hospital is called for only for the purpose of conducting diagnostic tests, or for a terminal patient to await the end, when all hope of treatment is gone, no coverage exists. AHS itself, in a series of cases, has made it plain that it is not the condition from which a patient suffers, but what treatment is called for which governs its obligations. See, e.g., Society of N. Y. Hosp. v. Burstein [Associated Hosp. Serv. of N. Y.] (22 A D 2d 768); Long Is. Coll. Hosp. v. Hertz [Associated Hosp. Serv. of N. Y.] (10 A D 2d 649). While obesity may not be as critical a condition, although more and more doctors are recognizing it as a real threat to life, and most cases of obesity can be medically managed without hospitalization, nevertheless if in a particular case ‘ ‘ proper treatment. ’ ’ requires the full use of hospital facilities, can coverage be denied?
The words “ necessary for proper treatment ” call into play the exercise of judgment. “Proper” in whose eyes? The patient’s, the treating physician’s, the hospital’s, an AHS administrator’s, or a court’s looking back on the events sometime afterwards? Although no cases have been brought to the court’s attention directly dealing with this problem, this court concludes that the applicable standards of judgment as to the treatment prescribed must be those of the treating physician.
*1041 Only the treating physician can determine what the appropriate treatment should be for any given condition. Any other standard would involve intolerable second-guessing, with every case calling for a crotchety Doctor Gillespie to peer over the shoulders of a supposedly unseasoned Doctor Kildare. The diagnosis and treatment of a patient are matters peculiarly within the competence of the treating physician. The diagnosis may be insightful and brilliant, or it may be wide of the mark, but right or wrong, the patient under his doctor’s guidance proceeds upon his theories and sustains expenses therefor. Can a hospitalization insurer rightfully decline to pay for the expenses incurred, on the theory that subsequent events may have proved the diagnosis or the recommended treatment to have been wrong?
Once the treating doctor has decided on the treatment, we may of course review his judgment as to whether or not hospital confinement was necessary for the particular treatment prescribed. The doctor who orders hospital confinement for the removal of a simple splinter or the lancing of a boil has almost certainly exceeded the bounds of proper medical judgment in providing for his patient. The doctor who orders hospitalization for major surgery clearly is correct in concluding that hospital confinement is necessary for that treatment, even though he may be in egregious error in deciding that major surgery is called for. Once the treating doctor has decided on a course of treatment for which hospitalization is necessary, his judgment cannot be retrospectively challenged.
A gall bladder or a liver condition may be treated by a radical operation or by allowing a healthy regimen and the healing passage of time to work the miracle of regeneration. Who can say with certainty which course of treatment is correct? But if the operation is decided on, can there be a denial of Blue Cross coverage because alternative courses of treatment were available ?
In this case doctors might differ as to what treatment should have been given to Mrs. Zorek for obesity and related disorders. The doctor who treated her concluded the appropriate treatment for the condition would be not further home dieting, or intensive exercise, or sanitarium care, but the Duncan regime. Other doctors might disagree as to prescribing the Duncan regime, but they were not treating Mrs. Zorek.
AHS makes much of the fact that the diagnosis of Mrs. Zorek’s condition was “ Obesity, exogenous”. In other words, they argue that her overweight was the result of overeating — hardly a condition calling for hospital treatment. Presumably, they *1042 would agree that obesity attributable to glandular dysfunction or endocrine imbalance would present a medical problem calling for hospital treatment, but urge that replacing the pleasures of food with the pledges of abstinence does not call for hospital confinement. This appears to the court to be an oversimplified approach to the problem. All obesity is caused by a bodily intake of more calories than are consumed in energy. Glandular troubles merely move the point at which calories become surplus up or down. With a lower metabolism, a lower food intake is called for. Whatever the metabolic rate, not one pound of weight can be added without consuming more food than the body requires. Classifying one species of obesity as “ exogenous ” and hence not a medical problem, creates wholly artificial lines of distinction. In the present state of our medical knowledge we cannot simply assert that no medical treatment is called for when we conclude that a person’s overweight is caused by “ over-eating ”, because for all we know the craving for excessive amounts of food may itself be traceable to a physiological imbalance or some as yet undiscovered need for a certain chemical equilibrium which a ” normal” intake of food does not satisfy.
The Duncan regime is a recognized medical treatment for obesity. While there is some controversy about it, and not all doctors would choose to resort to that treatment, many reputable doctors do. Doctor Bookman chose that treatment here. He having determined, within the scope of his medical competence, that the treatment was necessary, the sole question remaining is whether hospitalization was necessary for the treatment decided on.
AHS contends that what was done for Mrs. Zorek in the hospital demonstrates that hospitalization was not necessary. Apart from restricting her intake of food and administering vitamins, the patient was permitted to continue ambulatory and was weighed daily. All these things, AHS contends, were in the nature of custodial care and could have been done at home or in any sanitarium or rest home. Looking back, Mrs. Zorek’s stay was indeed uneventful. However, we must measure the necessity for hospitalization by the prospective potentialities for danger inherent in a treatment, and not by fortuitous actuality.
Dr. Bookman testified that the Duncan regime was a dangerous course of treatment, and because of the dangers involved called for careful supervision at all time. The patient’s blood, pressure, temperature, and body fluids had to be continuously checked to be certain that proper chemical balance was main *1043 tained, and he insisted much more than mere custodial care would be required. Indeed, severe shock and even death are known to have ensued for persons following the Duncan regime even under carefully supervised conditions, since the changes which occur may be sudden and drastic. Even the medical expert who testified for Blue Cross stated that while he personally would not recommend the Duncan regime, the reason he would not do so is because of its inherent danger. In fact, he said, it would be foolishness to place someone on a Duncan diet outside of a hospital with facilities for 24-hour supervision and a well-trained medical staff.
Fortunately, there were no adverse developments or complications for Mrs. Zorek during her hospital stay. The possibilities were ever-present however, and in any sensible society penalties are not to be imposed where common-sense precautions are taken. The court concludes that not only was hospitalization necessary once the Duncan regime was decided upon, but that it would have been medically irresponsible to have had anything less. Certainly we must presume that a busy metropolitan hospital complex like Mount Sinai was not going to make one of its much sought-after beds available for three weeks for a person who merely was seeking a “ rest cure ”, and the kind of enforced diet she could otherwise get on a milk farm. It was medical necessity and not cosmetic vanity which dictated the hospital stay.
There is one facet of this case which the court finds particularly disturbing, although having no direct bearing on the legal construction of the contractual provisions. Dr. Bookman had testified that Blue Cross had made payment for Mrs. Zorek’s prior hospital stay, when she was on an 800-calory diet. Of course AHS could choose to make voluntary payments even if coverage was debatable. But he testified he again checked on the phone with a Blue Cross representative who assured him it was all right to have his patient hospitalized for the Duncan treatment. After she was committed to the not inconsiderable expenses involved, and had gone to the hospital and completed her treatment, a Dr. Bieler of Blue Cross called Dr. Bookman and told him there had been a change of policy, and that AHS was cutting down on paying for hospital treatments for obesity. Dr. Bookman had three patients who had been so treated, and who had pending claims with Blue Cross. He was told the claim of one patient who was the daughter of a doctor would be paid, and that they would also pay the claim of whichever one of the two remaining patients he chose. This testimony *1044 was not rebutted or denied. A more arbitrary and patently unfair method of treating with claims can hardly be conceived, and certainly cannot be condoned.
It is the holding of this court in construing the Blue Cross contract that when multiple courses of treatment are available, whether for the obese, the alcoholic, or the addicted, if the treating physician chooses that treatment for which hospitalization is required, and rejects those treatments which can be adequately administered in a rest home or sanitarium, then, absent a specific contractual exclusion, there is full coverage for the hospital stay. The third-party plaintiff has met his burden of proving the existence of coverage and the absence of any disqualifying exclusion. (Cf. Society of N. Y. Hosp. v. Burstein, supra; Klar v. Associated Hosp. Serv. of N. Y., 24 Misc 2d 559; Tasman v. Associated Hosp. Serv. of N. Y., 19 Misc 2d 809.)
The amount of the hospital bill in this case attributed to Mrs. Zorek’s treatment for obesity came to $557.90, for which sum the plaintiff, Mount Sinai Hospital, is entitled to judgment against the defendant Warren Zorek, together with interest from the 25th day of June, 1963, and costs. Warren Zorek, in turn, as third-party plaintiff, is entitled to judgment in the same amount, $557.90 against the third-party defendant, Associated Hospital Service of New York, together with interest from the 25th day of June, 1963, and costs.