**GROUP HOSPITALIZATION, INC. and Medical Service of the District of Columbia, Appellants,**

v.

**Alec C. LEVIN and Anne Levin, Appellees.**

**No. 6709.**

District of Columbia Court of Appeals.

Argued Dec. 12, 1972.

Decided June 1, 1973.

Charles J. Steele, Washington, D. C., with whom John J. Carmody, Washington, D. C., was on the brief, for appellants.

J. E. Bindeman, Washington, D. C., with whom Leonard W. Burka, Washington, D. C., was on the brief, for appellees.

Before REILLY, Chief Judge, and KERN and HARRIS, Associate Judges.

REILLY, Chief Judge:

Of more than passing interest to persons covered by medical and hospital insurance is the principal issue presented by this case, for it requires this court to construe a typical clause in such policies relating to payments to private nurses. This appeal is brought to us by Group Hospitalization, Inc. and Medical Service of the District of Columbia (the carrier) from a judgment in favor of a patient and her husband who had brought suit for reimbursement for the expenses of private nursing for preliminary and postsurgical care provided the wife at the Washington Hospital Center on a policy issued to the husband and his dependents by the carrier. Such policy provided coverage for ". . . necessary medical services, supplies, and treatment ordered by a physician for the diagnosis or treatment of an illness . . .", including, *inter alia*, ". . . [c]harges by a registered private duty nurse (R.N.). . . ."

The basic facts of the case are not in dispute: After undergoing treatment at another hospital for a painful back condition, the patient was transferred to Washington Hospital Center by ambulance. Her ailment was diagnosed there as a ruptured intervertebral disk. This was removed by surgery. During the pre- and postoperative periods, which together lasted approximately one month, she was attended by private duty nurses assigned by her surgeon for 24 hours each day.[1] The carrier disallowed the claim for these services on the ground of not being "medically necessary."

The testimony revealed that after the operation Mrs. Levin's vital signs were good and she was in no danger of death. The evidence disclosed, however, that she was in severe pain and under constant medication to alleviate her suffering. Moreover, she was unable to turn herself in bed. Nor could she feed herself or perform other normal bodily functions without assistance. The attending surgeon conceded in his testimony that not all disk patients in the postoperative stage need private nurses,

---

1. While hospitalized, Mrs. Levin was quartered in one of the penthouse rooms where one of the conditions of occupancy is that patients provide their own private nurses for two of the three eight-hour shifts per day. We do not regard this aspect of the matter as controlling because the carrier conceded at trial that it would pay for private nurses if "medically necessary" no matter in what part of the hospital the patient was situated.

but averred that most of those with comparable pain did require such services. He stated that his patient was suffering as much pain as he had ever seen in a postoperative case and reiterated several times his opinion that private nurses were medically necessary. He admitted that she could have received similar services from the staff (floor) nurses—had the patient's room been in another section of the hospital—but asserted that they could not have provided the level of immediate and personalized service necessary to someone in her condition because of demands of other patients, some of whom might have priority in time.

The director of nursing services at the hospital testified for the carrier. She stated that the services provided by staff nurses would be adequate for most disk patients, even if in extreme pain, but conceded that they would not be adequate in all situations, and that it would be the function of the attending physician to determine this.

The evidentiary facts as found by the trial court are not in dispute, but the carrier contends that the conclusion derived from these facts by that court on the ultimate question of necessity was erroneous. Numerous opinions, none directly in point, are cited to us in which various courts have had occasion to define the word "necessary." The general tenor of these opinions is that the word imports something which is "indispensable" or "essential." Appellant argues that the facts of this case, when measured against such a standard, cannot support the conclusion of medical necessity.

The claimants, however, argue that all that is involved here is a simple question of fact and consequently this court is bound by the findings of the court below, unless clearly erroneous or unsupported by substantial evidence. They further contend that the evidence overwhelmingly supports the finding of medical necessity and must be affirmed.

■ This thesis is somewhat inaccurate. In the absence of ambiguity, the construction of contract terms is a matter of law. Cowal v. Hopkins, D.C.App., 229 A.2d 452 (1967); Rich v. Sills, D.C.Mun. App., 130 A.2d 920 (1957). What we have before us is a mixed question of law and fact. Thus the scope of our review is broad[2] and we would be free to reverse if it appeared that the court below attributed an incorrect meaning to the word "necessary."

■ The record shows that after making findings of fact the trial court without elaborating on the meaning of the key words "necessary medical services" in the insurance contract decided that such facts brought the disputed claim within this category. In light of the testimony, we are of the opinion that its conclusion did not constitute error. If special nursing care were not necessary in this instance, we should have a hard time imagining a case where it would be, short of one where the absence of a registered nurse responsible for only the particular patient would make the difference between life and death. The carrier disclaims insisting on so rigorous a test. While we are not disposed to promulgate an all-encompassing definition, we think it safe to say that necessary medical services include those reasonably calculated to shorten and relieve an ordeal of agonizing pain and thereby effectuate the most rapid recovery possible and that in the context of this case, such services included the assignment of private nurses.[3]

In agreeing with the trial court's conclusion, we do not mean to imply that the insurance clause at issue covers situations where private nurses are retained merely to alleviate discomfort or to provide the

2. D.C.Code 1972 Supp., § 17–305(a).

3. The claimants have moved this court, pursuant to Rule 38, to determine this appeal frivolous and award damages and costs. From our discussion, it should be obvious that this motion must be, and is, denied.

patient with the companionship and convenience of a special nurse. This court is not unmindful of the rising costs of medical insurance and recognizes that unless the term "necessary medical services" is given a literal meaning, the availability of insurance for private nurses could be abused by patients and oversolicitous physicians to the point of destroying the actuarial basis of current premium rates. In the instant case, had the carrier disallowed only those nursing expenses incurred after the immediate postsurgical exigency at a time when convalescence had progressed to the point that the vigil of a private nurse was no longer essential, such action might well have been justified. In oral argument, however, counsel for the carrier stipulated that it was taking an "all or none" position on the issue of liability. Hence this question was never reached.

■ The carrier's second assignment of error relates to an objection to a question that was sustained by the trial court. On cross-examination the attending surgeon had asserted that dependence on staff nurses might have resulted in delay of necessary services because of the need to attend patients in more precarious condition. The transcript shows (35):

Q [MR. STEELE] You say you take care of the sickest patients first. I assume from your own description of Mrs. Levin's condition that she would have been near the top of the list on [ward] 4F or 3F for care by the regular nurses.

A [DR. RIZZOLI] From the point of view of pain. But this is a floor with brain tumors on it, to respiratory distress, convulsions, those patients would come first, because there is a question of

dying from asphyxiation in these situations.

Q [MR. STEELE] Did all of those patients you have just described—do all of them have private duty nurses—the ones that are worse off than Mrs. Levin?

MR. BINDEMAN: If Your Honor please, I would object to that. I think counsel has gone further afield than he ought to be allowed to go.

THE COURT: Objection sustained. Confine your remarks to this particular patient.

Appellant contends that the question of whether patients who were "more ill or in worse condition" had private nurses was so relevant to the issue that it was error to prevent counsel from exploring the subject. We disagree. It should be noted that the witness was only speaking hypothetically. The particular patient was not on the floors mentioned, and even if she had been, patients with different ailments will obviously require different services. A person in a coma might be in danger of death, and in that sense, "worse off" than this patient, yet because of the dormancy of his condition not be in need of constant nursing care. Thus, whether or not such a person had private nurses was irrelevant to the question of whether such nurses were necessary for Mrs. Levin. The court had previously permitted counsel to ask whether most disk patients with comparable pain had private nurses. That information was clearly pertinent, but the information sought to be elicited by the question objected to was not.

Affirmed.