## Charles E. FREE, Jr.

### v.

## The TRAVELERS INSURANCE CO.

### Civ. No. JH-82-124.

United States District Court,
D. Maryland.

Nov. 26, 1982.

Edwin F. Nikirk, Frederick, Md. and Ronald A. Silkworth, and O'Connor, Preston, Glenn & Smith, Baltimore, Md., for plaintiff.

John H. Mudd, H. Thomas Howell, James F. Mewborn, and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

## OPINION

JOSEPH C. HOWARD, District Judge.

Charles E. Free, Jr., who is suffering from lymphoma (cancer of the lymph glands), brought this diversity action against the Travelers Insurance Co. ("Travelers"), seeking reimbursement in the sum of $18,256.48 for expenses incurred during the course of his laetrile[1] treatment, and a declaratory judgment compelling Travelers to pay future expenses covered under the insurance policy, including payments for laetrile and other substances.

The case was tried without a jury on September 22 and 23, 1982. The Court's findings of fact and conclusions of law here follow, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## BACKGROUND

Until he had to stop working in April or May of 1980 because of his illness, Charles Free was employed by Frederick Truck Equipment, Inc. of Frederick, Maryland, as a truck mechanic. He became an insured under the company's insurance contract by way of a certificate of insurance dated May 1, 1975.

In May 1980, Free was referred by his family doctor to the Johns Hopkins Hospital in Baltimore for diagnosis of the cause of his fatigue and abdominal swelling. The physicians there concluded that Free had non-Hodgkins lymphoma, and recommended chemotherapy treatment which the plaintiff chose to forgo at that time. When he expressed an interest in receiving laetrile treatment, the doctors at Johns Hopkins advised him that the drug was, quite simply, "useless." Defendant's Exhibit 14 at 24.

Through the recommendation of a Pennsylvania physician specializing in diet control and vitamin treatments, id. at 26, plaintiff then consulted Dr. Michael Schachter, a psychiatrist who practiced "nutrition and holistic[2] medicine" at Mountainview Medical Associates in New York. Although he had no training whatsoever in traditional

---

1. During the trial, "laetrile" was used synonymously with the chemical name amygdalin. The two substances have different chemical structures, however. Food and Drug Administration, Commissioner's Decision on Status of Laetrile, 42 Fed.Reg. 39768, 39770–71 (Aug. 5, 1977).

2. Dr. Schachter did not testify at trial, but his deposition was admitted into evidence as Plaintiff's Exhibit 17. He defined "holistic" as follows:

   [H]olistic is a term which refers to treating the whole person. The emphasis is on attempting to have a person attain an optimal state of health, rather than just treat [sic] him for diseases or for symptoms. It also emphasizes looking at the persons's [sic] lifestyle to get to the cause of illness, so that we would engage a patient in a program of nutritional support, optimal nutritional care, exercise programs; programs that deal with stress reduction and deal with psychological emphasis, and so forth.

   The concept of holistic, is one which you deal with preventive care, as well as examining the lifestyle of the patient, rather than just treating the symptom or treating the disease, per se. Plaintiff's Exhibit 17 at 6.

cancer research or treatment, Defendant's Exhibit 2, Dr. Schachter was, in his own view, capable of treating the disease holistically. Plaintiff's Exhibit 17 at 8–9, 112–115.

As a prerequisite to treatment by Dr. Schachter, Free signed an "informed consent" form in May 1980, which provided as follows:

I agree to undergo care with the doctors of Mountainview Medical Associates. I understand that care will consist primarily of nutritional and metabolic support in the form of dietary suggestions, food concentrates, vitamins, and minerals, by mouth or by injection. Medication or drugs may be recommended when indicated. Other accessory modalities such as an exercise program, Biofeedback training and meditative techniques may also be used.

Among the substances, medications, or drugs available, Amygdalin may be advised for the purpose of metabolic support. This substance is found in a wide variety of foods including apricot seeds, peach seeds, and millet. Some scientists and physicians regard this substance as a vitamin and call it Vitamin B–17. However, the predominant medical view including that of the Food and Drug Administration (FDA) and the American Medical Association (AMA) is that this substance is not a vitamin and has <u>no known value for metabolic support in the conditions for which we are using the agent, or in the treatment of any disease.</u> Nevertheless, on the basis of reviewing the world literature and experience, the Mountainview Medical doctors disagree with this view and feel that Amygdalin has a role in the total nutritional program.

I understand that no specific claim is being made for the cure, treatment, or amelioration of cancer or other diseases in the use of Amygdalin or the other modalities in paragraph one. I understand that some alleged authorities associated with the FDA and AMA assert that the use of this substance constitutes quackery and amounts to a hoax of the American people. I further understand that American physicians have been indicted in California for the use of this substance (which has also been called Laetrile).

I understand that any substance being injected, or taken orally, including vitamins, has the potential for having side effects. At the present time the only known side effects of Amygdalin are occasional lowering of blood pressure, nausea, or lightheadedness. These are generally mild, transient and are controlled by dosage changes. I understand that there have been some recent reports from animal studies that indicate if relatively large doses of Amygdalin are combined in a specific way with foods containing a high concentration of the enzyme beta glucosidase and then given to the animals orally, severe toxic reactions can occur. I have been told, however, that this research appears to have little to do with the way in which Amygdalin is given clinically in this practice. If any other side effects become known, I will be advised of them.

I understand that the Mountainview doctors are not cancer specialists and have little or no direct experience with the orthodox cancer therapy modalities of chemotherapy, radiation, or surgery for the treatment of cancer, and as such the Mountainview doctors are not in a position to advise me as to the relative benefits and risks of those treatments for my condition. I have been urged to seek consultation with appropriate cancer specialists (surgeons, radiotherapists and oncologists) to obtain information about the orthodox cancer therapies that would be applicable to me. It has been suggested that I obtain at least the following information: (1) What kinds of treatments may be reasonably expected to benefit my condition? (2) What are my chances of survival (over what period of time) if I agree to these treatments, and what are my chances of survival if I do not take these treatments? Be as specific as possible. (3) What may I expect of the quality

of my life (e.g. what are the side effects) during and after the treatment? (4) To what extent will the treatment damage my immune defense system and thus prevent my body from fighting the cancer cells?

I can obtain the names of cancer specialists in my community from my local county medical society or my local branch of the American Cancer Society.

I am aware that the opinion of these institutions or the individual cancer specialists may differ widely from the view of the Mountainview doctors in regard to the treatment of patients with cancer. I have nevertheless been urged to obtain as much information as possible, so that I may make an intelligent decision about my treatment.

Knowing and fully understanding all of the above, I willingly and freely of my own accord agree to undergo care with the doctors of Mountainview Medical Association.

Defendant's Exhibit 1.

Plaintiff testified that the informed consent form was fully explained to him, and that the decision to take laetrile and forgo chemotherapy was his own. He subsequently rejected the advice of two other physicians that he undergo chemotherapy. Defendant's Exhibit 8.

Dr. Schachter's treatment of the plaintiff consisted of the administration of laetrile, vitamins, and other nutritional substances. Plaintiff's Exhibit 12h. Laetrile therapy is legal in Maryland, *Md.Ann.Code,* art. 43, § 133, and available in interstate commerce through the affidavit system set forth in the orders of *Rutherford v. United States,* 438 F.Supp. 1287 (W.D.Okla.1977). Plaintiff's Exhibits 3, 4, and 5. Pursuant to *Rutherford,* both physician and patient must sign and swear to separate affidavits. Free stated that the contents of both affidavits were fully explained to him. Defendant's Exhibit 14 at 46–48. The physician's affidavit states in part:

3. That it is my professional opinion that the histological evidence of the above-named cancer patient demonstrates a rapidly progressive malignancy possessive of a high and predictable mortality rate. The above-named patient therefore is presently a terminally ill cancer patient.

4. I further affirm that based upon my professional opinion and knowledge of the facts concerning the above-named patient: [Check one of the following]

a. that further orthodox treatment would not reasonably be expected to benefit the patient; or

b. that laetrile will be administered only in conjunction with established and recognized forms of cancer treatment; or

c. that the patient has made a knowing and intelligent election to take laetrile after being fully apprized of the full range of recognized treatments available and of the fact that laetrile is considered by most cancer experts to be of no value in combatting the disease.

Susan Free, plaintiff's wife, testified that within one month after commencing laetrile and nutritional therapy, her husband was less tired, could walk farther, and that his night sweats subsided. The plaintiff testified that he no longer had sharp pains in his side after the treatment, and that he believed that the improvement in his condition was directly attributable to the use of laetrile. Concerning the latter, the Court finds otherwise for several reasons.

Defendant's experts, Drs. Martin Abeloff and William DeWys, highly qualified experts in oncology, testified credibly that plaintiff's improvement was most likely due to the natural progression of the illness, and that it was consistent with what a lymphoma patient would feel without any treatment at all. They stated that night sweats, which on occasion accompany lymphoma, often disappear for no apparent reason. Further, a diminution in abdominal pain would be expected as the muscles of the abdomen stretch to accommodate the buildup of fluid. Dr. DeWys testified that the degree of improvement that Free experienced was actually less than what would

have been expected if he had been given a placebo. For the above reasons and others which follow, and because the Court recognizes that improvement in a single individual following the administration of a drug is statistically insignificant, the Court finds that laetrile had no affect on plaintiff's condition.

Free last took laetrile in December, 1981. He filed suit on January 18, 1982. Free was hospitalized for approximately fifteen days prior to trial, and recently elected to receive chemotherapy.

## DISCUSSION

### A. Construction of the Insurance Policy

The major medical expense benefits portion of the policy at issue provided in relevant part that defendant would pay certain benefits if "an insured Employee shall necessarily incur Covered Medical Expenses." Under the policy, the term "covered medical expenses" meant the actual expense to the employee of charges incurred "upon the recommendation and approval of the attending physician for medical supplies required in connection with the treatment of the Employee." The term "medical supplies" included "drugs and medicines covered by written prescription of a physician." Plaintiff's Group Insurance Policy, Plaintiff's Exhibit 1.

The single issue before the Court is whether the expenses incurred by the plaintiff for laetrile treatment and other substances are covered medical expenses that were "necessarily incurred," and "required in connection with" plaintiff's treatment.

Even while acknowledging correctly that the case is controlled by Maryland law, plaintiff urged the Court to follow the presumption in New York law that insurance policies are to be construed liberally and in favor of the insured. *See Bruell v. Associated Hospital Service of New York* (Index No. 38361/78, Civil Court of New York) (Nov. 13, 1978).

■ The law in Maryland, however, is that an unambiguous insurance contract must be construed as any other contract would be, "without any predisposition toward either contractual party," notwithstanding an apparent hardship to one. *Bevans v. Liberty Mutual Insurance Co.*, 356 F.2d 577, 581 (4th Cir.1966); *Chicago Insurance Co. v. Pacific Indemnity Company*, 502 F.Supp. 725, 727 (D.Md.1980); *Mateer v. Reliance Insurance Co.*, 247 Md. 643, 648, 233 A.2d 797 (1967); *Harsanyi v. Hartford Accident and Indemnity Co.*, 41 Md.App. 685, 688, 398 A.2d 524 (1979).

If the pertinent portions of the instant insurance contract had been ambiguous, this Court would have been inclined to look to the subjective expectations of the average policyholder as an aid to construction. Because the language is unambiguous, however, the Court is obliged to give full force and effect to the terms according to the ordinary meaning of the words used. *Bevans, supra* at 581.

Whether plaintiff's expenses for laetrile and the other dietary substances were "necessary" depends upon whether the treatment was "appropriate," *Abernathy v. Prudential Insurance Company of America*, 274 S.C. 388, 264 S.E.2d 836, 838 (1980), or "wise in the light of facts known at the time [it was] rendered," *Victum v. Martin*, 367 Mass. 404, 326 N.E.2d 12, 16 (1975), or "reasonably calculated to shorten and relieve an ordeal of agonizing pain and thereby effectuate the most rapid recovery possible. . . ." *Group Hospitalization, Inc. v. Levin*, 305 A.2d 248, 250 (D.C.Ct.App.1973). And, "where there are indications that the medical services were patently inefficient, excessively repetitive [or] not conducive to producing desired medical results . . ., the necessity for the medical services may be subject to more searching inquiry." *Victum, supra* 326 N.E.2d at 16–17.

### B. The Case Against Laetrile

Three experts testified at trial: for plaintiff, Robert Henderson; for defendant, Drs. Martin Abeloff and William DeWys. Robert Henderson is a community pharmacist, who specializes in nutrition and dispenses laetrile. Dr. Abeloff is a medical oncolo-

gist, board certified in internal medicine, and an associate professor in the Department of Medicine and Oncology at the Johns Hopkins University Medical School. Dr. DeWys is Chief of the Clinical Investigations Branch of the National Cancer Institute.

The evidence adduced at trial demonstrated unequivocally that laetrile is a potentially dangerous drug that has no value in the treatment of cancer.

The Food and Drug Administration ("FDA") Commissioner's Decision on the Status of Laetrile stated the following:

> The evidence that experts in the evaluation of drug safety and effectiveness do not "generally" recognize Laetrile as effective for any therapeutic use is overwhelming. (It should be remembered that for recognition to be general it must be shown that most qualified experts recognize the drug's safety and effectiveness. The fact that a few persons claiming expertise believe the drug safe and effective is thus not sufficient.) The record contains statements that Laetrile is not considered as an effective cancer therapy from several organizations with members who are experts in cancer drug evaluation—e.g., the American Cancer Society, the American Medical Association, the Committee on Neoplastic Diseases of the American Academy of Pediatrics—and from a large number of the Nation's most eminent and well-qualified experts in the area of cancer drug evaluation. It is difficult to conceive of a clearer showing of a lack of "general" recognition of a drug's effectiveness than the expression of the views of these many experts.

42 Fed.Reg. 39768, 39781 (Aug. 5, 1977), Defendant's Exhibit 3. The FDA concluded that:

> (2) Neither Laetrile nor any other drug called by the various terms mentioned above ... is generally recognized by experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs to be safe and effective for any therapeutic use.

> (3) Animal studies conducted to date show that Laetrile has no anticancer activity in laboratory animals. Even if such activity were shown, the data would not be relevant to the issue of whether Laetrile is generally recognized by qualified experts as a safe and effective anticancer drug in humans...

> (5) The history and promotion of Laetrile are characteristic of other unproven cancer remedies. Laetrile's popular acceptance by laymen lies not in credible proof of its effectiveness, but rather in the fears of orthodox medical treatment and the false hope, fostered by Laetrile's proponents, that suffering and eventual death can be avoided through Laetrile.

> (6) Laetrile is not in general use as cancer therapy anywhere in the world...

> (8) The safety of ingesting amygdalin, Laetrile and/or apricot or peach kernels or pits has not been established. There is, in fact, evidence of frank toxicity from ingestion of the kernels or pits.

> (9) There is no basis in law or in fact for the use of Laetrile or related substances in the treatment of cancer.

*Id.* at 39806.

The recently published definitive study commissioned by the National Cancer Institute, authored by Dr. Charles G. Moertel, *et al.,* entitled "A Clinical Trial of Amygdalin (Laetrile) in the Treatment of Human Cancer," and published in the January 28, 1982 issue of the *New England Journal of Medicine,* reported that:

> One hundred seventy-eight patients with cancer were treated with Amygdalin (Laetrile) plus a "metabolic therapy" program consisting of diet, enzymes, and vitamins. A great majority of these patients were in good general condition before treatment. None was totally disabled or in pre-terminal condition. One third had not received any previous chemotherapy. The pharmaceutical preparations of Amygdalin, the dosage, and the schedule were representative of past and present Laetrile practice. No substantive benefit was observed in terms of cure, improvement, or stabilization of

cancer, improvement of symptoms related to cancer, or extension of life span. The hazards of amygdalin therapy were evidenced in several patients by symptoms of cyanide toxicity or by blood cyanide levels approaching the lethal range. Patients exposed to this agent should be instructed about the danger of cyanide poisoning, and their blood cyanide levels should be carefully monitored. Amygdalin (Laetrile) is a toxic drug that is not effective as a cancer treatment.

Defendant's Exhibit 9 at 201.

Defendant's witnesses, Drs. DeWys and Abeloff, whom the Court, as noted above, found credible, testified that they were familiar with the research techniques and methodology used to determine the effectiveness of potential cancer treatments. They agreed that the Moertel study was conducted according to accepted scientific standards, and emphasized that great care was taken by the researchers to make certain that the substances used and the methods of administration were representative of the practices of laetrile proponents.

The Moertel study concluded that laetrile is a toxic drug, id. at 206, and that whether administered intravenously or orally, in combination with high doses of vitamins and a special diet, it "is of no substantive value in the treatment of cancer," id. at 205.

## C. Plaintiff's Position

Plaintiff introduced no credible evidence establishing the efficacy òf laetrile. He argued, however, that he underwent laetrile therapy on the recommendation of a licensed physician, that he had a right to rely upon the advice of a physician, and that because an insurance carrier is free to specifically exclude a treatment from coverage, the carrier may not later reject a claim for treatment prescribed by a physician when it has not specifically excluded that particular treatment.

## D. Conclusion

■ As noted earlier, this Court is obliged to construe the key provisions of defendant's insurance contract in accordance with their usual and ordinary meanings. In view of the extensive, uncontroverted evidence dispelling any notion that laetrile is beneficial in the treatment of cancer, the Court finds that plaintiff's use of the drug was not "wise in the light of facts known at the time [treatment] was rendered," nor was it "appropriate" or "reasonably calculated to shorten and relieve an ordeal of agonizing pain and thereby effectuate the most rapid recovery possible."

■ Moreover, the plaintiff's unfettered right to select a physician and follow his advice does not create a corresponding responsibility in the defendant to pay for every treatment so chosen. As one court noted, "it is simply not enough to show that some people, even experts, have a belief in [the] safety and effectiveness [of a particular drug]. A reasonable number of Americans will sincerely attest to the worth of almost any product or even idea." United States v. Articles of Food and Drug Coli-Trol, 80 Medicated, 372 F.Supp. 915, 920 (N.D.Ga.1974), aff'd, 518 F.2d 743, 746–47 (5th Cir.1975). The Court is also mindful of the fact that to require insurers to pay for every remedy, proven or unproven, prescribed by a physician, could invalidate the actuarial basis of current premium rates. See Group Hospitalization, Inc. v. Levin, supra, 305 A.2d at 251. Finally, the Court notes that the plaintiff, by his own admission, was well aware that laetrile and nutritional therapy are disapproved of by the majority of cancer specialists. He was equally well informed of the accepted alternative, chemotherapy.

The Court concludes, therefore, that the laetrile expenses were not "necessarily incurred," and that the drug was not "required in connection with" plaintiff's treatment.

Regrettably, because the Court sympathizes with Mr. Free and his family, plaintiff's claims for reimbursement and a declaratory judgment will be denied.