SHUMAKE v TRAVELERS INSURANCE COMPANY

Docket No. 79850. Submitted July 8, 1985, at Grand Rapids.—Decided December 16, 1985. Leave to appeal applied for.

James Shumake underwent surgery for lung cancer and thereafter received drug therapy utilizing Laetrile and related nutritional supplements. Shumake's insurer, Travelers Insurance Company, paid for the expenses associated with the therapy from June, 1978, until January 31, 1981, at which time it notified Shumake that expenses for Laetrile and the associated nutritional supplements were not covered under the insurance policy. Subsequently Shumake and his wife, Norma Shumake, brought an action for a declaratory judgment against Travelers, seeking reimbursement for further therapy. The Ottawa Circuit Court, James E. Townsend, J., granted judgment in favor of the plaintiffs, holding that they were entitled to reimbursement for continued treatment prior to June, 1983, under the terms of the insurance policy. Defendant appealed, alleging that coverage had been properly denied under the policy because the expenses were not occasioned by "accidental bodily injury or sickness" and were not "necessarily incurred" or "required" in connection with treatment for a sickness, and the nutritional supplements were not "covered by written prescription of a physician" since they could be purchased without a prescription. *Held:*

1. The trial court did not err in finding that Shumake was suffering from a "sickness" at the time he received the Laetrile treatment, even though there was no evidence that his cancer had spread following the surgery. Furthermore, he received the treatment because of the cancer. The evidence presented was sufficient to establish a "sickness".

2. Defendant alleged that the Laetrile treatment cannot be

REFERENCES

Am Jur 2d, Insurance §§ 269-319.

Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 174-199.

Ambiguity: the parole evidence rule and admissibility of extrinsic evidence to establish and clarify ambiguity in written contract. 40 ALR3d 1384.

See also the annotations in the ALR3d/4th Quick Index under Insurance; Medical Treatment or Care.

regarded as necessary because it has been demonstrated to be ineffective. The term "necessary" is ambiguous, and ambiguities in an insurance contract are to be resolved in favor of the insured if possible. While a medical treatment or expense should not be held to be necessary merely because it is deemed so by a physician, a physician's judgment should be accorded deference. A decision as to necessity is to be reviewed in light of knowledge which existed at the time the decision was made.

3. Because of the diversity of opinion within the medical community at the time of Shumake's treatment as to the effectiveness of Laetrile, a physician at that time could properly determine that Laetrile was necessary and required for the treatment of cancer.

4. The policy did not limit coverage to drugs which could only be obtained with a physician's prescription, and Shumake's physician indicated that the reason for prescribing the nutritional supplements was to control the dosages. The policy provided coverage for the supplements under the circumstances.

Affirmed.

1. INSURANCE — AMBIGUOUS LANGUAGE — JUDICIAL CONSTRUCTION.

Ambiguities in an insurance contract are to be construed against the insurer which drafts the contract and resolved in favor of the insured; an insurance policy should not be construed to defeat coverage unless the language so requires since the purpose of insurance is to insure.

2. PHYSICIANS AND SURGEONS — MEDICAL TREATMENT — NECESSITY OF MEDICAL TREATMENT.

A medical treatment or expense should not be considered to be necessary or required merely because it is deemed so by a physician; however, a physician's judgment should be accorded deference and a decision as to the necessity of a course of treatment is to be reviewed in light of medical knowledge which existed at the time the decision was rendered.

*Catchick & Dodge* (by *James M. Catchick*), for plaintiffs.

*Smith, Haughey, Rice & Roegge* (by *Lance R. Mather*), for defendant.

Before: Wahls, P.J., and Allen and J. C. Rav-
itz,* JJ.

Allen, J. In this declaratory judgment action,
plaintiffs sought reimbursement for Laetrile (am-
ygdalin) and related nutritional therapy prescribed
for James Shumake by his physician, Philip E.
Binzel, M.D. Dr. Binzel determined that Shumake
suffered from a metabolic disorder, a diagnosis he
reached based primarily on the fact that Shumake
had developed lung cancer. The Laetrile and nutri-
tional supplements were prescribed as a treatment
for the metabolic disorder. The trial court held
that under the terms of the policy, plaintiffs were
entitled to reimbursement in the amount of
$17,478.20. Defendant appeals as of right.

Plaintiffs were insured under a group health
insurance policy issued by defendant Travelers
Insurance Company to James Shumake's former
employer, Service Reproduction Company. On May
26, 1978, Shumake underwent surgery for removal
of the right upper lobe of his right lung after a
cancerous tumor was discovered. His prognosis was
guarded, with doctors estimating his chances of
survival over the ensuing five years as between 15
and 25 percent. Shumake consulted a general
practitioner, Dr. Binzel, who prescribed a course of
treatment involving a regimen of Laetrile, en-
zymes and vitamins, and certain nutritional guide-
lines. Defendant paid all expenses associated with
this treatment from June, 1978, to January 31,
1981. Defendant then notified plaintiffs that expen-
ses for Laetrile and Laetrile-related nutritional
supplements were not covered under the subject
insurance policy.

The policy at issue provides coverage for 80

* Recorder's Court judge, sitting on the Court of Appeals by assign-
ment.

percent of "covered medical expenses" which are "necessarily incur[red]". "Covered medical expense" is defined as:

"[T]he actual expense to the Employee of the reasonable charges (as defined) [1] not hereinafter excepted incurred by the Employee on account of himself or his Dependent upon the recommendation and approval of the attending physician for the services and supplies listed below and required in connection with the treatment of the Employee or his Dependent for any [accidental bodily injury or sickness]."

Included in the list of covered medical expenses are "medical supplies", which are defined to include "[d]rugs and medicines covered by written prescription of a physician".

The insurance policy does not contain any exclusion which would specifically preclude coverage for Laetrile and Laetrile-related nutritional supplements. Nonetheless, defendant maintains that coverage was properly denied, advancing three arguments: (1) the expenses were not occasioned by "accidental bodily injury or sickness"; (2) the expenses were not "necessarily incurred" or "required" in connection with treatment for a sickness; and (3) the nutritional supplements were not "covered by written prescription of a physician" since they could be purchased over-the-counter.

Defendant argues that Shumake was not sick within the meaning of the policy since all of the cancer had been surgically removed and there was

---

[1] Defendant does not argue that the charges for Laetrile and nutritional supplements were unreasonable within the meaning of this provision, presumably because the policy's definition for reasonable charges states: "The extent that a particular charge is 'reasonable' shall be measured and determined by comparing it with the charges customarily made for similar services and supplies to individuals of similar medical condition in the locality concerned." There is no indication that the charges for Mr. Shumake's treatments were inconsistent with local standards.

no evidence that the cancer had spread. Regardless of these indicators, plaintiffs were informed after the surgery was completed that Shumake's chances of survival were poor, that he had at least a 75 percent chance of cancer reappearing, and that he would most likely die from the cancer. Further, he was advised to consult an oncologist for further treatment, despite the fact that his doctors believed all of the cancer had been removed. Dr. Melvin L. Reed, a defense expert who examined Shumake four years after his surgery, testified that, as a post-operative treatment, radiation therapy to the middle chest would have been advisable. In light of these factors and testimony at trial indicating that cancer is not considered "cured" until five years have passed without incident, we do not believe that the trial court erred in finding that Shumake was suffering from a "sickness" at the time he received the Laetrile treatment.

Defendant argues in the alternative that cancer was not the "sickness" for which Shumake was receiving treatment. A treatment agreement entered into between Shumake and Dr. Binzel states that Binzel was treating Shumake for a metabolic disorder. Defendant maintains that since laboratory tests were not performed to verify the disorder, no "sickness" was established.

Dr. Binzel testified that he did not order laboratory tests because numerous tests would be required to isolate specific nutritional deficiencies and the tests would have been costly. Moreover, he believed that the presence of cancer was indicative of a metabolic disorder and that monitoring the patient's response during the course of therapy was a preferred method for determining whether deficiencies were being adequately treated. It appears from the record before us that Laetrile

practitioners generally operated on the central premise that cancer resulted from metabolic imbalances. Proponents believed that if the disorder could be cured, the body's defense mechanisms would then operate to avert a recurrence of cancer.

This issue appears to pose two distinct concerns. First, defendant places substantial weight on the treatment agreement indicating that Shumake was being treated for a metabolic disorder and not for cancer. Yet, the metabolic disorder and the cancer were intricately related. The purpose of the treatment was to enhance the body's defense mechanisms so that they would take over to ward off cancer. The treatment would never have been prescribed if Shumake had not contracted cancer. By way of affidavit, Binzel stated that he was treating Shumake "for lung cancer and its attendant side effects". Moreover, the crux of defendant's argument on the question of whether Laetrile therapy was "necessarily incurred" is the assertion that the treatment was ineffective in the treatment of cancer—not that it was ineffective in the treatment of a metabolic disorder. Regardless of the efficacy of treatment and the disclaimers in the agreement, we believe that the inescapable result is that Shumake received this treatment because of the cancer. Since we have already determined that he was suffering from a "sickness" as a result of the cancer, coverage cannot be denied on this basis.

In addition, defendant's argument relative to whether Shumake was sick goes to a basic tenet upon which Laetrile practitioners operated, *i.e.,* that cancer was indicative of a metabolic disorder. Although defendant presented substantial evidence which challenges the logic of this reasoning, defendant failed to negate the fact that at the time

Shumake's treatment commenced there was a strong and viable minority in the medical community which adhered to these basic tenets and believed that Laetrile was an effective means of controlling cancer. We recognize that the weight of authority held a contrary view. However, we are not prepared to determine as a matter of law that a diagnosis subject to conflicting medical opinions is fallacious merely because a majority of the medical community would arrive at a distinct conclusion. Accordingly, we believe that the evidence presented was sufficient to establish a "sickness".

The next issue presented for our consideration is whether Laetrile and related nutritional treatments were necessarily incurred covered medical expenses and required in connection with Shumake's treatment. Defendant maintains that the treatments have been demonstrated to be ineffective and that, as a result, they cannot be regarded as necessary or required for the treatment of cancer.

The trial court found that "necessarily incurred" was an ambiguous term. It then relied on *Van Vactor v Blue Cross Association,* 50 Ill App 3d 709; 8 Ill Dec 400; 365 NE2d 638 (1977), to hold that the necessity of a medical treatment or expense should be determined by the attending physician. Defendant points out that such a construction of medical necessity could lead to absurd results. For example, such a construction of the policy would require coverage where a physician prescribed bizarre or archaic treatments, such as bloodletting, simply because the physician deemed it necessary. Defendant therefore urges us to follow the reasoning of *Free v Travelers Ins Co,* 551 F Supp 554 (D Md, 1982), which, in construing an identical provision of an insurance policy, found

that the language was unambiguous. The *Free* court went on to hold that Laetrile could not be regarded as necessary for the treatment of cancer since the evidence presented at trial overwhelmingly indicated that Laetrile had no value in the treatment of cancer.

We cannot agree with the initial premise of the *Free* opinion, that the terms "necessarily incurred" and "required" for treatment are unambiguous. Three distinct definitions of the term "necessary" are cited at 551 F Supp 558: *Abernathy v Prudential Ins Co of America,* 274 SC 388; 264 SE2d 836 (1980) (equating "necessary" with "appropriate"); *Victum v Martin,* 367 Mass 404; 326 NE2d 12 (1975) (necessary means "wise in the light of facts known at the time rendered"); and *Group Hospitalization, Inc v Levin,* 305 A2d 248 (DC App, 1973) ("necessary" means "reasonably calculated to shorten and relieve an ordeal of agonizing pain and thereby effectuate the most rapid recovery possible"). Reference to *McLaughlin v Connecticut General Life Ins Co,* 565 F Supp 434 (ND Cal, 1983), illustrates that *Free's* list of definitions was not exhaustive. *McLaughlin* cites, *inter alia, Fassio v Montana Physician's Service,* 170 Mont 320; 553 P2d 998 (1976) (finding that the language "necessary services" requires only that services be prescribed and performed by a licensed physician), and *Aetna Life Ins Co v Sanders,* 127 Ga App 352; 193 SE2d 173 (1972) (holding that the language "necessary to the treatment" should be construed to accord great weight to a physician's recommendation). Moreover, *McLaughlin* provides a new definition, stating that " '[n]ecessary care' implies that the care is in some degree beneficial to the patient". 565 F Supp 451. In *Dallis v Aetna Life Ins Co,* 574 F Supp 547, 551 (ND Ga, 1983), the court found that the term "necessary" was

ambiguous, relying primarily on Black's Law Dictionary (5th ed, 1979), which defines the term as follows:

"This word must be considered in the connection in which it is used, as *it is a word susceptible of various meanings.* It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought. It is an adjective expressing degrees, and may express mere convenience or that which is indispensible or an absolute physical necessity. It may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought." (Emphasis added.)

Since the terms "necessary" and "required" are capable of diverse connotations, we find that the provisions in the subject insurance policy are indeed ambiguous. It is a well-established principle that ambiguities in an insurance contract are to be construed against the insurer which drafts the policy and resolved in favor of the insured. *Farm Bureau Mutual Ins Co of Michigan v Hoag,* 136 Mich App 326; 356 NW2d 630 (1984). A policy should not be construed to defeat coverage unless the language so requires since the purpose of insurance is to insure. *Arrigo's Fleet Service, Inc v Aetna Life & Casualty Co,* 54 Mich App 482; 221 NW2d 206 (1974), *lv den* 392 Mich 812 (1974).

The language "necessarily incurred" or "required" implies that some entity must exercise judgment in determining when a medical expense will be covered. When the insurer does not reserve the right to exercise that judgment itself by way of

an exclusion,[2] we believe that the approach of the trial judge and *Van Vactor, supra,* is reasonable. A physician is generally better equipped than lawyers and judges to discern what is medically necessary. Cognizant that a rubber stamp approach to a physician's unfettered exercise of discretion could result in coverage for inane treatments, we decline to hold that any treatment or expense is necessary or required merely because it is deemed so by a physician.

However, we do hold that a physician's judgment should be accorded deference. Moreover, since medicine is an evolving science in which treatments are at one time regarded as valid and later discredited, we hold that a decision as to necessity shall be reviewed in light of knowledge which existed at the time the decision was rendered.

Employing such a standard does not dispense with this issue since the gist of defendant's argument is that Laetrile falls within the category of inane cancer treatments and was recognized as ineffective at all times during which Mr. Shumake received treatment. In support of these contentions, defendant relies on the decision of the Commissioner of Food and Drugs on Laetrile, dated July 29, 1977. See 42 Fed Reg 39768-39806 (1977) (hereinafter referred to as the Commissioner's re-

---

[2] Defendant maintains that requiring exclusions for Laetrile and similar medicines which are generally regarded as ineffective would be impractical due to numerosity. Further, it argues that a general exclusion for drugs and treatments not approved by the Food and Drug Administration would be undesirable since it would preclude coverage for drugs and treatments in the experimental stage which are known to be effective. We do not believe that defendant would meet with resistance if, despite an exclusion for non-FDA approved drugs, it chose to afford coverage out of benevolence. In any event, we believe that defendant could fashion an exclusion which would allay such concerns. For example, it could limit coverage to drugs and medicines which have not been renounced by the American Medical Association or exclude drugs and treatments which are controversial.

port). Further, defendant points to a study on Laetrile which was commissioned by the National Cancer Institute. The results of this study were originally published on January 28, 1982. See Moertel, *A Clinical Trial of Amygdalin (Laetrile) in the Treatment of Human Cancer,* 306 New England Journal of Medicine, p 201 (1982) (hereinafter referred to as the Moertel study).

In 1977, the Food and Drug Administration issued the foregoing report after conducting extensive hearings on the issue of whether Laetrile constituted a "new drug" within the meaning of the Federal Food, Drug, and Cosmetic Act, 21 USC 301 *et seq.* "New drugs" are excluded from distribution in interstate commerce unless a new drug application is approved by the FDA. A new drug will not be approved unless its safety and effectiveness is established. See 21 USC 355. However, these requirements need not be met if a drug comes under one of the act's two grandfather clauses. See 21 USC 201, as amended by 21 USC 321.

The hearings convened by the FDA were attended by proponents and opponents of Laetrile. Based on these hearings, the FDA concluded that there was "no basis in law or in fact for the use of Laetrile or related substances in the treatment of cancer". Commissioner's report, *supra.* A review of the Commissioner's report discloses that although the FDA acknowledged that Laetrile was *generally* regarded as ineffective by qualified experts, the FDA did not categorically conclude that Laetrile was ineffective. Rather, the FDA's determination was based on a lack of scientific evidence which might have demonstrated that Laetrile was safe and effective. In other words, Laetrile proponents failed to meet the requisite burden of proof.

The FDA's determination with respect to Lae-

trile was challenged by terminally ill cancer patients in *Rutherford v United States,* 438 F Supp 1287 (WD Okla, 1977), *aff'd* 542 F2d 1137 (CA 10, 1978), *rev'd and remanded sub nom United States v Rutherford,* 442 US 544; 99 S Ct 2470; 61 L Ed 2d 68 (1979), *rev'd on remand,* 616 F2d 455 (CA 10, 1980). Plaintiffs sought to prohibit the FDA from interfering with the interstate shipment and sale of Laetrile. The district court enjoined the FDA from interfering on two grounds. First, it held that Laetrile came within the act's 1962 grandfather clause since it had "been commercially used and sold in the United States for the treatment of cancer for well in excess of 25 years [prior to 1962], during which time it [had] been 'generally recognized' by qualified experts as safe for such use". 438 F Supp 1295. The court also held that the FDA's interference with Laetrile use violated the plaintiff's constitutional right to privacy. On appeal to the Tenth Circuit, that court affirmed. It acknowledged that a drug would have to be regarded as effective prior to 1962, as well as safe, but held that the safety and effectiveness requirements of the statute had no application to terminally ill cancer patients, finding that the standard of "safety and effectiveness" had little meaning with respect to persons fatally stricken with a disease where "laetrile [was] as effective as anything else". 582 F2d 1234, 1237. The United States Supreme Court reversed, holding that the act provided no exception from the safety and effectiveness requirements for drugs used by the terminally ill. Interestingly, the Supreme Court noted that, at the time it rendered its decision, an application for clinical testing of Laetrile by the National Cancer Institute was pending before the FDA Commissioner. See 442 US 558. On remand from the Supreme Court, the Tenth Circuit re-

versed the district court on the invasion of privacy issue, holding that the governmental interest in protecting public health outweighed the patient's decision to have a particular treatment. The court noted that Laetrile use was being prevented by the FDA because of the proponent's failure to meet the burden of proof, not because Laetrile had been demonstrated to be ineffective.

Our review of the Commissioner's report and the *Rutherford* decisions reveals that there was no definitive determination in the scientific community or the courts with respect to Laetrile's effectiveness throughout 1980. Effectiveness had not been proven or disproven. Indeed, these decisions indicate that the debate on Laetrile was still raging in 1980 and that notable institutions were still investigating its use. Moreover, a number of states enacted statutes which permitted intrastate distribution of Laetrile despite the FDA's ban on interstate distribution. See *e.g.,* West's Ann Ind Code 16-8-8-1 *et seq.;* West's Fla Stat Ann 499.137 *et seq.;* 63 Okla St Ann 2-313.1 *et seq.;* NJSA 24:6F-1 *et seq.;* Md Ann Code, art 43, § 133 *et seq.* Due to the diversity of opinion and Laetrile's questionable status at that time, we believe that a physician could properly exercise discretion so as to determine that Laetrile was necessary and required for the treatment of cancer during this period.

Publication of the Moertel study, however, appears to have terminated the controversy over Laetrile's effectiveness. After administering Laetrile to various control groups while following the regimens recommended by leading Laetrile practitioners, the researchers concluded that:

"[n]o substantive benefit was observed in terms of cure, improvement, or stabilization of cancer, improvement of symptoms related to cancer, or extension of life span.

The hazards of amygdalin therapy were evidenced in several patients by symptoms of cyanide toxicity or by blood cyanide levels approaching the lethal range. * * * Amygdalin (laetrile) is a toxic drug that is not effective as a cancer treatment." Moertel study, *supra,* p 201.

We have not been provided with any indication that the findings of the Moertel study have been challenged by subsequent studies. At oral argument, plaintiffs' counsel conceded that Laetrile is now recognized as ineffective. In the absence of documentation to refute the Moertel study findings, we would not hold in the future that Laetrile is a necessarily incurred medical expense or required for treatment. However, based on the time frame when these treatments were administered to Shumake and the controversy which was transpiring, we hold that Dr. Binzel's decision as to necessity should be accorded deference.[3]

Finally, defendant argues that the nutritional supplements were not covered under the policy since they could be acquired without a prescription. The policy provides coverage for "drugs and medicines covered by the written prescription of a physician". It is uncontroverted that the nutritional supplements at issue were covered by Binzel's written prescriptions. The policy did not limit its definition of "medical supplies" to drugs which could *only* be secured with a physician's prescrip-

[3] We acknowledge that the trial court found that Mr. Shumake's treatments were covered through June 8, 1983, while the Moertel study was published on January 28, 1982. However, it is reasonable to assume that there would be some time lag between publication of new research findings in professional journals and the time when such findings would become part of the informational base available to practicing physicians. Moreover, since this was the only published study which met established scientific standards, and Mr. Shumake had not had a recurrence of cancer and appeared to be responding positively to the Laetrile therapy, we believe that it was reasonable to continue his regimen for this period so as to afford an interval of time wherein the new findings might have been studied, evaluated, critiqued and challenged.

tion. Moreover, defendant acknowledged that it provided coverage for nutritional supplements for patients receiving radiation treatments and chemotherapy since malnutrition is often associated with these treatments. Further, Binzel stated that one reason why he prescribed these nutritional supplements was so that he could closely control the dosages that Shumake would receive, a factor which presumably cannot be monitored with medicines that are sold over-the-counter. Since the policy language did not limit coverage to what are generally recognized as "prescription drugs", and the language used must be construed against the insurer, we find that coverage for the nutritional supplements was provided under the terms of the policy.

Affirmed. Costs to plaintiffs.