592 A.2d 1098

Henry S. SABATIER

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY et al.

No. 106, Sept. Term, 1990.

Court of Appeals of Maryland.

July 23, 1991.

Richard D. Rosenthal, Baltimore, for petitioner.

Leonard C. Redmond, III (Louise McB. Simpson, Redmond, Cherry & Burgin, P.A., Baltimore, Steven C. McAliley, West Palm Beach, Fla.), all on brief, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), specially assigned.

MURPHY, Chief Judge.

The primary question presented is whether thermography is a valid diagnostic tool for medical use in the diagnosis and treatment of musculoligamentous injuries, musculoskeletal disease, or nerve root impingement and is therefore compensable as a "necessary" medical service within the coverage of Maryland Code (1991 Repl.Vol.), Article 48A, § 539 (the Personal Injury Protection or PIP statute). This section of the Maryland Insurance Code provides that, unless waived by the insured, every policy of motor vehicle liability insurance shall afford, *inter alia*, medical benefits for the named insured and family members residing in the household who are injured in an automobile accident. The medical benefits under this section, are in an amount up to $2,500, and must be for "reasonable" expenses for "[n]ecessary medical ... services."

## I.

Dr. Henry S. Sabatier, a physician licensed to practice in Maryland, sued State Farm Mutual Automobile Insurance Company in the District Court, sitting in Baltimore City, to recover for thermography services rendered to a number of State Farm's policyholders who were covered for PIP medical benefits.[1] State Farm denied payment, claiming that thermography examinations in the diagnosis and treatment of musculoligamentous injuries, musculoskeletal disease and/or nerve root impingement, as performed by Dr. Sabatier, were not necessary medical treatments as defined in § 539 and, therefore, were not reimbursable under the PIP statute. Upon demand for a jury trial filed by State Farm, the cases were removed to the Circuit Court for Baltimore

---

1. The policyholders assigned their benefits to Dr. Sabatier.

City. Subsequently, State Farm filed a counterclaim seeking a declaratory judgment that the services in question were not within the coverage of § 539.[2]

By order dated September 14, 1989, the trial court bifurcated the issues before it. The order provided that the "threshold issue [concerned] the validity of [the] thermographic examinations" performed by Dr. Sabatier and that this issue would be decided in a separate trial. The order further provided "that only in the event that this court determines that thermography is valid ... shall the other issues presented by this case be tried." The court said that if validity is shown by a preponderance of the evidence, it would then consider thermography in the context of the "reasonable and necessary" language of § 539.

At the trial, evidence was adduced that clinical thermography is a medical diagnostic technique that measures and maps infrared radiation emanating from the skin surface to show skin temperature. There was evidence that in a normal patient's thermogram, one side of the patient's body will match the other side, reflecting a symmetry of temperature, while patients with an injury or pathology will show an asymmetrical measurement of the injured body part with its corresponding side. Eleven medical expert witnesses testified and approximately 200 exhibits were received in evidence. The proponents of thermography testified that it is a reliable, objective, non-invasive diagnostic test, while its detractors testified that it is virtually useless as a diagnostic aid.

The court made detailed factual findings from the evidence before it. In weighing the validity of thermography, the court followed the criteria for admissibility of scientific evidence as articulated under the so-called *Frye–Reed* test.

---

**2.** Dr. Sabatier also sued Government Employees Insurance Company (GEICO) for the same kind of thermographic examinations rendered to GEICO policyholders. These cases were consolidated with the State Farm cases, and they were tried together before Judge Joseph H.H. Kaplan sitting without a jury. GEICO is a party to this appeal.

While noting that this standard governed the admissibility of scientific evidence in criminal cases, the court nevertheless found it to be instructive in the present case. It explained that *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923), held "that expert testimony on the proof of scientific results would not be admitted in criminal cases unless the underlying principle was 'sufficiently established to have gained general acceptance in the particular field in which it belongs.'" *Frye, supra,* 293 F. at 1014. The court noted that this Court later adopted the *Frye* test in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), a criminal case involving the admissibility of spectrograms, commonly described as "voiceprints."

Relying upon *Windmere, Inc. v. International Ins. Co.,* 105 N.J. 373, 379, 522 A.2d 405 (1987), the trial court looked to three sources to determine the general acceptability required under the *Frye–Reed* standard. It first considered the expert witness testimony. It then reviewed the scientific literature presented at trial. Finally, it evaluated other persuasive judicial authority that considered the general acceptability of thermography.

As to the expert testimony, the court concluded:

"The testimony presented favors the defendants under the *Reed/Frye* general acceptability standard.... The defendants established (and the plaintiffs concurred) that thermography was not widely accepted within the relevant medical community. Moreover, through a preponderance of the evidence, the testimony offered by the defendants' experts was of greater persuasive value. Thus, under the *Reed/Frye* test, the first leg of the analysis, the expert testimony, is satisfied. Second, even without *Reed/Frye*, the balance of the evidence presented by the witnesses decisively favors the defendants."

The court further found:

"The general acceptability of thermography is not demonstrated by the available scientific literature. Plaintiff has offered some evidence of valid testing. However,

because the testing was outside reliable protocol ..., the results are suspect. The testing offered by the defendants, while certainly not conclusive, has the benefit of a measure of objectivity. As such, this literature is afforded greater weight."

Finally, after considering the relevant judicial decisions of other jurisdictions, the court stated that

"the opportunity to consider thermography has not arisen for the majority of states. The few jurisdictions that have adjudicated the issue of admissibility of thermography are split. Thus, the persuasive value of these cases, within the *Windmere* parameters, is inconclusive as a result."

Based on these findings, the court concluded:

"[T]hermography, as a medical diagnostic procedure for the treatment of musculoligamentous injuries, musculoskeletal disease and nerve root impingement, is an invalid medical procedure. Pursuant to a review of the relevant evidentiary standards as presented at trial, this Court finds that the plaintiff has failed to meet his threshold burden of validity. Accordingly, this Court does not reach the questions of whether thermography, under Section 539, is a necessary service or involves a reasonable expense."

Dr. Sabatier appealed to the Court of Special Appeals. We granted certiorari prior to consideration of the case by the intermediate appellate court to consider the significant issue of public importance presented in the case.

## II.

Dr. Sabatier contends that the *Frye–Reed* standard for determining the admissibility of scientific evidence in a criminal case is not an appropriate standard by which to ascertain whether a particular diagnostic technique is fundamentally valid and constitutes a reasonable and necessary medical procedure compensable under § 539. He argues that the standard of proof as to the medical efficacy of

thermography as a diagnostic test ought to be reasonable medical proof by medical practitioners. Specifically, he suggests that this Court adopt a standard which gives credence to the acceptance of a medical procedure by physicians who are (1) trained and knowledgeable in the procedure, its intended use and clinical benefit; (2) familiar with the literature and procedure; and (3) accepted by sufficient physicians utilizing the procedure so as to demonstrate that said procedure has probative medical value and efficacy. Dr. Sabatier, alternatively, suggests that even if the *Frye–Reed* test is applicable, the evidence is sufficient to satisfy that standard. He also contends that the lower court improperly discredited the testimony of his expert witnesses based on their personal and financial stake in the use of thermography. Moreover, he says that the fact that State Farm's witnesses were not trained and skilled in the clinical use of thermography entitles their testimony to little weight.

State Farm maintains that the trial court's reliance on the *Frye–Reed* test was appropriate. It asserts that while this standard is typically applied in an evidentiary context, its purpose—the determination of whether a scientific technique is of such general acceptance as to permit the trier of fact to rely upon it in resolving an issue before it—coincides with its fact-finding function in the present case. State Farm further argues that adoption of Dr. Sabatier's test, with its reliance upon the views of only those practitioners who utilize a procedure, rather than establishing any sort of objective standard of general acceptance, provides an almost fool-proof means of establishing validity. Thus, it urges that failure to consider the testimony of knowledgeable experts who do not utilize the procedure is to limit the court's determination to those with only favorable views as to a technique's purported validity.

### III.

In a forty-one page memorandum opinion supporting its resolution of the case, the trial court (Kaplan, J.) chronicled

the evidence adduced before it. It first observed that, as early as 1938, researchers recognized a possible relationship between breast cancer and skin temperature. Referring to an article published in 1957 concerning "thermographic imaging," [3] the court related that the article claimed that the skin of malignant breast tumors is usually 1 to 3 degrees centigrade warmer than the other areas of the breast, and that with appropriate measurement of skin temperature, these tumors could be diagnosed. This report, as Judge Kaplan stated, "spawned additional research and other areas of the body were gauged and studied"; that in the thirty years since that initial report, numerous thermal scanning devices have appeared; and that the "standard accuracy of these devices show a variance of 0.1 degree Centigrade in the measurement of surface skin temperature."

Judge Kaplan observed that the focus of the evidence was upon thermography in the medical context of nerve and soft tissue injuries and was based upon the body's continual emission of heat. He concluded from the evidence that the pictures obtained by the thermographers (called "thermograms") reflect the heat given off by the blood flow on the surface of the skin and that thermography "scans and records the surface of the body to a depth of between six to ten millimeters to measure that heat emission." The court explained:

"The principal theory of thermography involves the symmetrical pattern through which this heat is released. That is, a normal patient's thermogram will show heat which is constant. Thus, one side of that patient's body will match the other side creating a symmetry of temperature. Conversely, patients with a pathology have a restricted blood flow beneath the skin's surface. This causes an asymmetrical measurement of the injured body part with its corresponding side. Thermography is prem-

---

**3.** Lawson, *Thermography—A New Tool in the Investigation of Breast Lesions,* 13 Canadian Service Med.J. 517–21 (1957).

ised on the concept of comparable anatomical zones of the body with asymmetrical patterns being indicative of disorder. Thermography seeks to measure and graph those potential disorders."

From the evidence before him, Judge Kaplan determined that the most popular means to measure skin temperature is through the use of an infrared camera, the imaging process being called Electronic Infrared Thermography (EIT); the process senses skin temperature and translates it into colored images reflecting corresponding heat emission. In his memorandum opinion, Judge Kaplan related that the camera's pictures "are then transmitted to a television monitor and 35mm slides are produced," and that temperature changes are represented by a color coded picture of the patient's affected areas, the different colors representing a one degree centigrade variance in skin temperature.

Judge Kaplan summarized the evidence describing the procedure for conducting a clinical thermographic examination. He stated:

"Several days prior to conducting a clinical thermographic exam, the patient is instructed on how to minimize outside influences on skin temperature. These instructions would include a restriction on smoking, the limited use of cosmetics or lotions, and an avoidance of excessive sun, for a period of time before the exam.

"On the day of the examination, the patient is then requested to complete a medical history form which specifies the area of injury. Other factors such as prior fractures or surgery are noted. The body area to be examined is sponged with water and dried with cool air. The patient is then put in a draft-free room for 30 minutes to allow the patient's body temperature to equilibrate to the ambient room temperature. The room temperature is usually set at 68 to 74 degrees Fahrenheit with a low relative humidity. Following the stabilization of the patient's temperature, the patient is led to the instrument room for thermographic examination. The examination room is set to the same

temperature as the previous room. A standard thermographic exam consists of three series of pictures taken at 15 minute intervals. These pictures are then evaluated and interpreted by the diagnosing physician. The technician that is responsible for administering the thermograms is often a person without formal medical training. The technician is required, however, to complete coursework through the designated thermographic institutions."

There was evidence before the court that with the proper protocol a patient undergoing a thermographic examination "is believed incapable of manipulating body temperature," an essential factor in "identifying and treating trouble spots that conventional diagnosis has overlooked." There was evidence that thermography reduces the need for other more intrusive diagnostic testing, thereby relieving the need to subject a patient to other potentially hazardous diagnostic procedures.

Judge Kaplan noted that Dr. Sabatier had the burden of proving, consistent with the *Frye–Reed* standard, that "thermography has achieved a certain degree of acceptability among its Peers." Considering first the testimony of knowledgeable experts, Judge Kaplan said that the testimony at trial revealed a sharp difference of opinion, with Dr. Sabatier relying only on experts actively engaged in the clinical practice of thermography. As to their testimony, Judge Kaplan said that Dr. Sabatier "did not produce a single witness that was not intricately (and financially) tied to thermography," a factor to be taken into account in determining whether their testimony was "derived from scientific fact, and not motivated by bias."

Specifically, Dr. Sabatier, in addition to his own testimony, offered expert testimony from Dr. Jacob Green and Dr. Jack Hubbard, both board certified neurologists; Dr. Bernard Filner, a board certified anesthesiologist; and Dr. Joseph Uricchio, a board certified orthopedic surgeon. They testified that thermography is a valid diagnostic test for musculoligamentous injuries, musculoskeletal disease and nerve root damage, and is also useful for reflex sympa-

thetic dystrophy, myofacial pain, and peripheral nerve entrapment syndromes (carpal tunnel syndrome). Judge Kaplan acknowledged that these experts were well acquainted with the "theoretical underpinnings" of thermography as well as its factual basis. He said:

"The experts recounted numerous clinical episodes where the use of thermography located a pathology that was missed by other procedures. Slide shows were presented that graphically illustrated the asymmetrical-symmetrical distinction. They noted that thermography detects 'trigger points' in the body which generate heat caused by muscle constrictions. The experts concluded, that through the appropriate protocol, thermography, either as a primary or as an adjunctive technique, is reliable. Their individual clinical success stories were offered, in part, as proof of the value of the procedure."

According to the evidence, Dr. Green conducts 600 thermograms per year in his private medical practice. He also acts as a medical director for a manufacturer of thermographic equipment, for which he is paid approximately $10,000 annually. Dr. Filner completes approximately 700 thermograms per year at an average cost of $325. The evidence showed that thermographic equipment necessary for producing thermograms costs $40,000, while equipment used for a CT scan and a Magnetic Resonance Imager, two primary medical imaging services, costs in the millions of dollars and requires highly trained personnel for its operation. By contrast, the evidence showed that thermography technicians need only scant training to operate the equipment, thereby resulting in low overhead costs, and greater profitability to the physicians utilizing thermography.

Expert testimony introduced by State Farm was to the effect that thermographic examinations were a useless diagnostic tool. The testimony of these experts, Judge Kaplan said, was superior to that of Dr. Sabatier's experts and their explanations "as to thermography's ineffectiveness were factually based, graphically demonstrated and uncontroverted by the plaintiff's witnesses." Judge Kaplan

found, as to these experts, that they had a collective wealth of experience and expertise to establish their credibility and were not biased. He first recounted the testimony of Dr. Charles Ash, a board certified orthopedic surgeon with thirty-five years of medical experience, who took issue with the central theme of thermography, as follows:

"Advocates of thermography claim that it objectively pictures a pathology because the skin temperature is controlled by the flow of blood to the nerve endings. Additionally, the proponents note that specific changes in thermal temperature also occur at 'trigger points,' areas of the body said to initiate pain or nerve root irritation. However, Dr. Ash has noted, in recent experiments, that there are inherent errors involved in imaging a curved surface such as the human body. To demonstrate, Dr. Ash showed slides of a thermogram that was taken of a balloon filled with two liters of water heated to 80 degrees Fahrenheit. The heat loss was factored and the balloon was stated to be comparable to a bald human head. Then, the balloon was rotated 90 degrees, 180 degrees and 270 degrees and thermographically imaged in each position within 30 seconds. No appreciable heat loss was experienced from the balloon in a 30 second window. The result showed four distinct colors on each rotation. The area closest to the camera was the warmest spot on each rotation. Because a thermogram shows diverse colors for each one degree Centigrade, the balloon represented a four degree Centigrade range. The relatively uniform temperature of the balloon should have reflected only one color. Dr. Ash believes that thermographic imaging equipment with its two dimensional depictions does not accurately measure the rounded surface of a patient. The three degree Centigrade margin of error is, as Dr. Ash reported, prohibitively high.

"Dr. Ash also has conducted an informal polling of practicing orthopaedic surgeons. In a random sample of 405 Active Fellows in the American Academy of Orthopaedic Surgeons, Dr. Ash received 316 responses to a questionnaire on the use of thermography. Of these, 293 Fellows

affirmatively replied that they had treated neck and back pain. Eighteen of this group (6.1%) noted that they had performed or prescribed thermography. Fourteen of these eighteen (4.8%) found thermography a valid test."

Another witness testifying for State Farm was Dr. William Deyerle, a board certified orthopedic surgeon who had been in practice for almost fifty years. He had guest lectured throughout the country on orthopedic surgery, had taught medical school and post-graduate courses, and published over fifty articles on the subject. He testified that he was acquainted with thermographic procedures and stated that thermography was not generally accepted by orthopods and had no diagnostic value. He said that thermography is not included in any medical school curriculum and is not mentioned by the American Academy of Orthopedic Surgeons as even an evolving procedure.

State Farm's most convincing witness, according to Judge Kaplan, was orthopedic surgeon, Dr. John McCulloch, board certified in both the United States and Canada. He had published twenty-nine papers, authored four textbooks, and lectured on numerous occasions throughout the world. In his twenty-year career, Dr. McCulloch estimated that he had performed some 12,000 to 14,000 operations and had diagnosed triple that number. His orthopedic speciality involved the spinal regions, including musculoligamentous injuries, musculoskeletal disease, or nerve root impingement. Judge Kaplan summarized his testimony (footnotes omitted) as follows:

"Dr. McCulloch noted the role of a spinal surgeon is to consider the scientific validity of any test used and verify clinical impressions. He is responsible for examining patients, arriving at a diagnosis, then attempting to prove the diagnosis by ordering tests. To that degree, Dr. McCulloch has 'carefully' considered various modalities of testing to evaluate the sensitivity and specificity of the tests. Again, Dr. McCulloch, like all of defendants' witnesses, is not an expert in thermography by means of a regular clinical contact with the procedure. Rather, as an expert in the

field, Dr. McCulloch is compelled to pass judgment on the validity of thermography to verify his clinical diagnosis.

"Dr. McCulloch, in conjunction with Dr. Leo Mahoney, has conducted one of the only blinded studies of thermography that exists. Twenty-three patients were selected with known disc herniation resulting in nerve root impingement. Additionally, twenty-five normal control subjects were selected. The patients had a 'clear-cut' clinical diagnosis verified by the 'gold standard' at that time [meaning a diagnostic test most widely regarded as sensitive and specific]. All of the study patients were tested by thermography. The individual that interpreted the thermogram was unaware of any previous diagnoses, i.e., the study was blinded. Of the normal group, symmetrical back and leg thermograms occurred in less than 25% of the patients. In the study group, the lumbar thermograms had a sensitivity (ability to identify the disorder) of 35% Thermograms taken of the legs had a sensitivity of 48%. As Dr. McCulloch observed:

'[W]hat we showed was that there were almost as many patients with a clear-cut diagnosis who had normal thermograms and there were some supposedly normal patients who had abnormal thermograms and thus the sensitivity and specificity of thermography in terms of a valid investigative tool was no better than the flip of a coin.'

\*　　\*　　\*　　\*　　\*　　\*

"On cross-examination, Dr. McCulloch was questioned on the false positives that his normal patients showed. Was it not possible that these normal patients had some hidden problems, such as varicose veins, infections, tumors? Dr. McCulloch replied:

'[O]ne of the problems with thermography is the claim to its specificity is so broad that by definition of the thermographers it's a non-specific test. It shows not only varicose veins but neuropathies, radiculopathies, arthritis, vascular disorders. It shows so much in the way of lower extremity pathology that they admit it is a non-specific

test ... This test is a non-specific, non-sensitive test and we should stop using it.'"

Professor Jan Stolwijk, the Chairman of the Department of Epidemiology and Public Health at the Yale School of Medicine, also testified for State Farm on the dynamics of human heat regulation. He noted that while the human body is primarily symmetric, people do not develop symmetrically in all cases, and consequently thermography is neither sensitive nor specific enough to provide diagnostic validity.

State Farm also adduced the testimony of Dr. David Buchholz, the Director of the General Neurology Clinic at Johns Hopkins University. He said that he was unaware of any evidence that thermography can substitute for clinical tests or other tools that are currently available to the neurologist. Dr. Buchholz testified that the high number of false positives and false negatives makes thermography not only unreliable but dangerous, and that he knew of only one neurologist that uses thermography.

There was also the expert testimony of Dr. Larry Empting, the Director of the Pain Treatment Center at Johns Hopkins. After qualifying as an expert in neurology, psychology, pain treatment and thermography, he testified, as recounted by Judge Kaplan, that

"a common claim of thermography is the ability to diagnose reflex sympathetic dystrophy ('RSD'). RSD is associated with severe pain, swelling and vasomotor disturbances of an affected limb. Of the approximately 100 patients per year that are referred to Dr. Empting as having RSD, 75% were misdiagnosed and do not in fact have RSD. Of those 100 referred patients, 95% had a thermogram as the confirming test. Dr. Empting reported that this type of misdiagnosis makes thermography invalid and even harmful. He added that thermography has little acceptance in pain treatment and no acceptance in neurology."

Judge Kaplan concluded that State Farm's experts "presented solid opposition against the validity of thermography"; that these witnesses "were credible, unambiguous in their assertions, eminently qualified and unbiased"; and that, as a diagnostic test, thermography lacks the specificity to localize and characterize the injury and thus fails to provide sufficient information upon which to base a decision regarding surgery.

As to Dr. Sabatier's witnesses, Judge Kaplan said that they failed "to provide adequate reasons why thermography, after 30 years of existence, is not currently in wider use." As to this, he contrasted thermography with more complex equipment such as Magnetic Resonance Imaging, which "has only recently surfaced, yet its approval among physicians is unquestioned."

As to the medical literature, Judge Kaplan indicated that articles introduced into evidence by Dr. Sabatier provided "some support" for his claim that thermography is a valid diagnostic test. But Judge Kaplan believed that this literature "suffer[ed] from [a] shortage of credibility," since much of it was based on studies conducted by thermographers or was published or authored by a group "that stands to gain the most by the proposition's acceptance." He concluded that no thermographic studies demonstrated the necessary criteria for valid scientific protocol.

Literature produced by State Farm, Judge Kaplan said, was more credible and entitled to greater weight. This literature concluded that thermography was not a valid diagnostic test, and it referred to the absence of scientific tests to establish the diagnostic efficacy of thermography. Among other studies noted by Judge Kaplan were the 1985 and 1989 Reports of the Office of Health Technology Assessment (OHTA), a division of the United States Department of Health and Human Resources, which is charged with evaluating new or unestablished medical technology. The earlier report concluded that the evidence of thermography's effectiveness was not thoroughly tested, and that further studies were needed to validate thermography as a

clinically effective diagnostic procedure. The 1989 report of OHTA stated that thermography has failed to support claims of efficacy as a useful diagnostic modality.[4]

Based on this evidence, Judge Kaplan determined that the general acceptability of thermography is not demonstrated by the available scientific literature.

As to judicial decisions in other jurisdictions involving the admissibility of thermographic evidence, Judge Kaplan noted that several jurisdictions, applying the *Frye* standard, have concluded that, because thermography is not widely accepted in the scientific community, such evidence was inadmissible. *See McAdoo v. United States*, 607 F.Supp. 788 (E.D.Mich.1984); *Kluck v. Borland*, 162 Mich.App. 695, 413 N.W.2d 90 (1987); *Burkett v. Northern*, 43 Wash.App. 143, 715 P.2d 1159 (1986). Judge Kaplan noted that other courts where the issue of the admissibility of thermographic evidence was considered reached a contrary result. *See Fay v. Mincey*, 454 So.2d 587 (Fla.App. 2 Dist.1984); *Blanchard v. A–1 Bit & Tool Co.*, 406 So.2d 773 (La.Ct. App.1981); *Procida v. McLaughlin*, 195 N.J.Super. 396, 479 A.2d 447 (1984). As to the Florida and New Jersey cases, Judge Kaplan observed that more recent cases in those jurisdictions have refused to admit thermographic testimony because the evidence presented was insufficient to establish the requisite reliability and acceptance in the medical community. *See Crawford v. Shivashankar*, 474 So.2d 873 (Fla.App. 1 Dist.1985); *Ferlise v. Eiler*, 202 N.J.Super. 330, 495 A.2d 129 (1985).

Finally, Judge Kaplan referred to *Thermographic Diagnostics v. Allstate*, 219 N.J.Super. 208, 530 A.2d 56 (1987), a decision by a single trial judge, which involved whether a thermographic examination was a "necessary" medical expense under New Jersey's PIP statute. In that case, the

---

**4.** *See* Lemperle, Carter and Forrell, *Thermography for Indications other than Breast Lesions,* Health Technology Assessment Series, No. 6 (1985); Handelman, *Thermography for Indications other than Breast Lesions,* Health Technology Assessment Reports, No. 2 (1989).

court held that the necessity of a medical expense is a determination for the treating physician and thus was reimbursable where ordered by a physician. Judge Kaplan believed that Maryland's PIP statute was more narrowly drawn, and that under *Huntt v. State Farm Mutual,* 72 Md.App. 189, 527 A.2d 1333 (1987), the treating physician is not the absolute arbiter of the necessity of a prescribed procedure.

Based on the expert testimony, the medical literature, and the decided cases, Judge Kaplan's ultimate finding was that thermography, as a medical diagnostic procedure for the treatment of musculoligamentous injuries, musculoskeletal disease, or nerve root impingement was an invalid medical procedure. Accordingly, he said that the question of whether thermography is a "necessary" service or involves a "reasonable" expense is rendered moot.

## III.

■ After careful review of the voluminous record in this case, we conclude that the *Frye–Reed* standard of general acceptability, while providing a helpful framework for assessing the admissibility of the results of a diagnostic procedure, is a standard more stringent than the legislature intended when, in enacting § 539, it formulated the "necessary" and "reasonable" test for reimbursement for medical services. We do not, therefore, consider whether thermography is a valid scientific diagnostic test under the *Frye–Reed* evidentiary standard. In adopting that standard in *Reed v. State, supra,* Judge Eldridge for the Court adopted the view, 283 Md. at 386, 391 A.2d 364, that *Frye* was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence in criminal cases based upon new scientific principles. That reasoning is manifestly inapplicable in determining whether a medical procedure qualifies as a "necessary" medical service within the intended coverage of § 539. Indeed, the primary purpose of this statute is to assure prompt financial compensation to victims of motor vehicle accidents without regard to

fault, and without the delays entailed by tort litigation. *See Insurance Com'r v. Prop. & Cas. Corp.*, 313 Md. 518, 532, 546 A.2d 458 (1988); *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986). And, as we said in *Tucker*, 308 Md. at 75, 517 A.2d 730, the Maryland PIP statute has a clear remedial purpose and therefore must be afforded a liberal construction. Thus, in focusing upon the wording of § 539, and undertaking to glean the meaning of a "necessary" medical service, we do not perceive a legislative intent to restrict coverage of any medical procedure simply because the utility of that procedure may be subject to differing opinions in the medical community and is therefore controversial. The only evidentiary standard erected by the Maryland PIP statute for recovery of expenses for necessary medical services is contained in § 544(a) of the Insurance Code, namely, that payments must be made upon "satisfactory proof" being presented to the insurer.

When, as here, the legislature has not defined the phrase "necessary medical ... services," it should ordinarily be given its usual and natural meaning. *Tucker*, 308 Md. at 73, 517 A.2d 730. We recognize the rule, however, that where a key word in a statute, like "necessary," is plainly susceptible of more than one meaning, and thus contains an ambiguity, courts consider not only the literal or usual meaning of the word, but its meaning and effect in the context of the statute in light of the setting, the objectives, and purpose of the enactment. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628 (1987); *State v. Bricker*, 321 Md. 86, 92, 581 A.2d 9 (1990). We think this rule is applicable in this case.

Black's Law Dictionary 1029 (6th ed. 1990), in defining "necessary," states:

"This word must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought. It is an adjective expressing degrees, and may

express mere convenience or that which is indispensable or an absolute physical necessity. It may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought." Furthermore, the wide variety of interpretations given similar language by courts in other jurisdictions indicates that there is little consensus as to a definition. *See McLaughlin v. Connecticut General Life Ins. Co.*, 565 F.Supp. 434 (D.C.N.D.Cal.1983). *See also Abernathy v. Prudential Ins. Co. of America*, 274 S.C. 388, 264 S.E.2d 836 (1980) (the term "necessary" to be construed as meaning appropriate); *Fassio v. Montana Physicians' Services*, 170 Mont. 320, 553 P.2d 998 (1976) (implicit in the use of the word "necessary" is the conclusion that medical services are necessary when so prescribed or performed); *Victum v. Martin*, 367 Mass. 404, 326 N.E.2d 12 (1975) (medical services "necessary" under no fault insurance act if treatment rendered by competent medical doctor was bona fide effort to alleviate and ameliorate the injury); *Lockshin v. Blue Cross of Northeast Ohio*, 70 Ohio App.2d 70, 434 N.E.2d 754 (1980) (term "necessary" refers to services which are indispensable, essential, unavoidable, compulsory or required); *Group Hospitalization, Inc. v. Levin*, 305 A.2d 248 (D.C.App.1973) ("necessary medical services" include those reasonably calculated to shorten and relieve an ordeal of agonizing pain and therefore effectuate the most rapid recovery possible). *See also Adams v. Blue Cross/Blue Shield of Maryland, Inc.*, 757 F.Supp. 661 (D.Md.1991); *Dallis v. Aetna Life Ins. Co.*, 574 F.Supp. 547 (D.C.N.D.Ga. 1983), *aff'd* 768 F.2d 1303 (1985); *Shumake v. Travelers Insurance Co.*, 147 Mich.App. 600, 383 N.W.2d 259 (1985); *Sarchett v. Blue Shield of California*, 43 Cal.3d 1, 233 Cal.Rptr. 76, 729 P.2d 267 (1987); Annotation, *Thermographic Tests: Admissibility of Test Results In Personal Injury Suits*, 56 A.L.R.4th 1105 (1987); Lustigman, *Ther-*

*mography's Place in the Courtroom* 40 Am.U.L.Rev. 419 (1990).

*Palma v. State Farm Fire & Cas. Co.,* 489 So.2d 147 (Fla.App. 4 Dist.1986), *review denied,* 496 So.2d 143 (1986), squarely presented the issue of whether thermography was a necessary medical expense under Florida's PIP statute. There, the court said:

"While the record contains evidence which supports the trial court's finding that thermography is of unproven and dubious value in the diagnosis of musculoskeletal disease and nerve root impingement, such evidence does not support the trial judge's conclusion that the use of thermography in the instant case did not constitute a necessary medical service under the No–Fault Act. The broad scope of the medical services covered by the No–Fault Act is highlighted by the inclusion of benefits for remedial treatment and services for an injured person who relies upon spiritual means through prayer alone for healing in accordance with his religious beliefs." *Id.* at 149.

The court recognized that a board certified radiologist, two board certified orthopedic surgeons, a board certified neurologist, and the insured's treating chiropractic physician all testified that the thermographic examination as related to the insured constituted necessary medical services for treatment of the injury she received in the automobile accident. It rejected the test applied by the trial judge to determine whether thermography was a "necessary" medical expense under the statute, namely, that a diagnostic procedure, to be medically necessary, had to be (1) widely accepted by the practicing peer group; (2) be based upon scientific criteria accepted by the majority of that peer group; and (3) not be of an experimental or investigative nature. The appellate court, in ordering payment for the thermographic services, said that this test was too restrictive to comport with the liberal interpretation of that state's PIP statute in favor of the insured.

The trial court's decision in *Thermographic Diagnostics v. Allstate*, 219 N.J.Super. 208, 530 A.2d 56 (1987), that a thermographic examination was a necessary medical service under the New Jersey PIP statute involved a six-week trial. That case presented "in depth the opinions of doctors and other experts ... concerning the current thinking in the medical profession about the usefulness of thermography as a diagnostic tool." *Id.* 530 A.2d at 57–58. The court there noted "a deep chasm of disagreement between doctors" who support the use of thermography and those who have found it to have no provable value. *Id.* at 58. The court stated that the goal of the PIP legislation was to maximize the flow of individual losses into payable claims and to provide an equitable and uniform schedule of benefits for all victims. *Id.* at 63. The court further stated that under the PIP statute, the "necessity of a medical expense must be decided by the treating physician, the one most qualified to make such judgment." *Id.* at 66. The court held that "need" is shown if the treating physician orders a thermographic test based upon his sincere belief that the procedure will further the diagnosis and treatment of his patient. *Id.* The trial court's decision that thermography was a "necessary" medical service was adopted by the intermediate appellate court. *Thermographic Diagnostics v. Allstate*, 241 N.J.Super. 88, 574 A.2d 485 (1990), *review granted* by the Supreme Court of New Jersey, 122 N.J. 338, 585 A.2d 353 (1990).

■ There is much support in the record for Judge Kaplan's conclusion that, unlike generally accepted diagnostic procedures, thermography is of somewhat dubious value to a substantial segment of the medical and academic community. There is contrary evidence from physicians that while thermography is not generally or widely accepted in the medical community, nevertheless, it is a useful diagnostic test, at least in some circumstances. At the same time, there is no allegation that those physicians who utilize thermography as a diagnostic tool in their care and treatment of patients do not do so in the good faith belief that it

is an efficacious diagnostic procedure. Nor is there any suggestion that thermography borders on "quackery," or that state medical disciplinary boards have ever sanctioned those physicians who use and charge patients for this procedure.[5] Moreover, there is evidence in the record that thermography is used by at least one physician at Johns Hopkins Hospital in Baltimore, the Georgetown Hospital in Washington, D.C., and the Mayo Clinic. We note also the following from a 1987 "Informational Report of the Council on Scientific Affairs," an advisory committee of the American Medical Association which, while concluding that "further well controlled, blinded studies are necessary to evaluate the full extent of the usefulness of thermography," said:

"Thermography is a safe adjunctive physiological procedure which may be useful in the diagnosis of selected neurological and musculoskeletal conditions. Thermography is noninvasive and does not involve the use of ionizing radiation. Thermography may facilitate the determination of spinal nerve root and distal peripheral nerve dysfunction. Thermography also contributes to the evaluation of possible autonomic nervous system dysfunction and of spinal disorders.

"Thermography may be useful in documenting peripheral nerve and soft tissue injuries, such as muscle and ligament sprain, inflammation, muscle spasm, and myositis. Thermography is helpful in the diagnosis of reflex sympathetic dystrophy and can be used to follow the course of patients after spinal surgery.

"In those applications, thermography does not stand alone as a primary diagnostic tool. It is a test of physio-

---

5. In this regard, it is not suggested that the insured's right to select a physician and follow his advice creates a corresponding responsibility in the insurer to pay for every treatment so chosen. *See, e.g., Free v. Traveler's Ins. Co.,* 551 F.Supp. 554 (D.Md.1982), involving the use of laetrile therapy for cancer patients where there was no evidence supporting the medical efficacy of laetrile.

logical function that may aid in the interpretation of the significance of information obtained by other tests."

Giving the required liberal interpretation of § 539, as our cases require, it need not be shown, as we earlier said, that the medical procedure be of general acceptance within the relevant medical and scientific community; rather, to be a "necessary" medical service within the contemplation of § 539, it must be shown by satisfactory proof that the use of thermography, as related to the patient's condition, and to the use and availability of other generally accepted and applicable diagnostic tests, has efficacious material value of its own as a diagnostic aid. In this regard, the legislature did not intend that § 539 be narrowly read to deny payment for a medical procedure ordered by a physician simply because a majority of the medical or academic community does not believe that it is a useful diagnostic tool. That thermography may qualify in some circumstances as a "necessary" medical service under § 539 is not to say that its use, in all circumstances, even though ordered by a physician, will necessarily entitle the insured to payment of PIP benefits. As Dr. Sabatier recognizes in his brief, diagnostic over-treatment or wrongful treatment of a patient would constitute improper medical treatment which could not be deemed "necessary." We also disagree that it is solely for the treating physician to decide whether a thermographic examination is a "necessary" service, or that the standard of proof of "necessity" is a medical judgment to be made only by those who are trained in and practicing thermography. As the Supreme Court of California said in *Sarchett, supra,* 729 P.2d at 272 (relying upon numerous cited cases from other jurisdictions), for purposes of payment of insurance medical benefits, " 'medical necessity,' or similar policy language is an objective standard to be applied by the trier of fact, not a delegation to the treating physician."

Giving due regard to Judge Kaplan's right, as the trier of fact, to discount the expert testimony of any witness, the question before him was not one of fact as to the fundamen-

tal validity of thermography under the *Frye–Reed* standard; rather, it was whether thermography is a "necessary" medical service under the less restrictive, legislatively intended application of § 539's formulation of a medically "necessary" service. In other words, the issue is not a factual determination, applying the *Frye–Reed* standard, of the validity or invalidity of thermography but whether, under § 539, the thermographic examinations involved in these cases were, in view of the medical condition of each patient, a necessary service within the coverage of the statute. If, without regard to the *Frye–Reed* standard of general acceptability, the trier of fact concludes that some or all of these thermographic examinations were totally devoid of any diagnostic value, then they could not be deemed "necessary" under § 539.

## IV.

As earlier observed, Judge Kaplan bifurcated the issues in the case as he saw them, focusing first upon whether thermography was fundamentally invalid.

By Judge Kaplan's order dated November 21, 1989, expressly approved in writing by counsel for the parties, both as to form and content, all issues in the case were to be tried nonjury. Consequently, there is no merit to Dr. Sabatier's present argument that he was entitled to rely upon State Farm's prayer for a jury trial. Without question, Dr. Sabatier waived his right to a jury trial and the waiver, by the express terms of the order, applied to all issues in the case, including whether thermography was a necessary medical service and whether, if so, the charges for that service were reasonable. In view of our holding today, a remand of the case to decide these remaining questions is necessary and will be tried without a jury.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION TO DETERMINE WHETH-

ER THE THERMOGRAPHIC EXAMINATIONS PER-
FORMED IN THE CONSOLIDATED CASES CONSTI-
TUTE "NECESSARY" MEDICAL SERVICES UNDER
CODE, ARTICLE 48A, § 539 AND, IF SO, WHETHER
THE CHARGE FOR SUCH EXAMINATIONS WAS "REA-
SONABLE" WITHIN THE MEANING OF THE STAT-
UTE; COSTS TO ABIDE THE RESULT.