OPINION OF THE COURT
Jack M. Battaglia, J.
*609 A no-fault insurer defending a denial of first-party benefits on the ground that the billed-for services were not “medically necessary” must at least show that the services were inconsistent with generally accepted medical/professional practice. The opinion of the insurer’s expert, standing alone, is insufficient to carry the insurer’s burden of proving that the services were not “medically necessary.”
CityWide Social Work & Psychological Services, P.L.L.C. billed Travelers Indemnity Company a total of $1,181.63 for psychiatric/psychological services rendered by “Dr. Seidman Ph.D.” to CityWide’s assignor, Tremayne Brow. (Nowhere in any of the claim documents or reports does a given name for the psychologist appear.) The bill contains separate charges for “Psychiatric Evaluation of Records and other accumulated data for medical diagnostic purposes”; “Psychiatric Diagnostic interview examination”; five hours of “Psychological testing (includes Psychodiagnostic assessment with interpretation and report . . .)”; “Explanation and interpretation of results to primary physician”; and “Psychotherapy.” More than half the total charges ($696.50) were for the five hours of testing and related services. Travelers denied the claim based upon a “NHR analysis” performed by Andrew M. Elmore, Ph.D., in which he concluded that “available medical records completely fail to establish medical necessity” for the services covered by the bill. This action resulted.
At the January 16, 2004 trial, the parties stipulated that CityWide submitted proper proof of claim and that Travelers made timely denial. The only issue for trial was the medical necessity of the billed-for services, an issue on which Travelers bore the burden of proof. (See Elm Med., P.C. v American Home Assur. Co., 2003 NY Slip Op 51357[U], *8-9 [Civ Ct, Kings County].) Dr. Elmore testified on behalf of Travelers, and Dr. Bruce Baumgarten, also a psychologist, testified for CityWide. Dr. Baumgarten had no professional relationship to the patient, Tremayne Brow. Dr. Seidman, the psychologist who rendered the services, did not testify, nor did “Dr. Kostin,” the otherwise unidentified “referring and treating specialist” according to Dr. Seidman’s reports.
The referral to CityWide was apparently based upon a “Self-Referral Consent and Authorization Form for Examination of Patient’s Need for Psychological Testing/Psychotherapy,’’ completed by Mr. Brow on January 29, 2001. (The subject accident occurred on December 16, 2000.) The form lists 16 *610 “problems or condition[s],” of which 12 were circled by Mr. Brow to indicate that they applied to him. The circled items include increased nervousness, nightmares, “sad mood,” flashbacks, irritability, and “changes in level of functioning at work/at school.”
After a review of records and an interview with Mr. Brow, Dr. Seidman administered the Beck Anxiety Inventory, Beck Depression Inventory, Beck Hopelessness Scale, a “PD-3” (pain patient profile) and PDS (posttraumatic stress disorder scale). Dr. Seidman prepared a “[m]edical necessity letter regarding psychological evaluation” (dated Jan. 29, 2001),: a “Narrative Report” (dated Mar. 7, 2001), and a “Psychological Evaluation” (dated Mar. 15, 2001). He diagnosed Mr. Brow with “Adjustment Disorder with Mixed Anxiety and Depressed Mood,” and treated Mr. Brow with at least one hour of psychotherapy. Dr. Elmore reviewed Dr. Seidman’s reports in performing his analysis, and prepared a written report dated April 16, 2001.
Dr. Elmore testified with apparent strong conviction that none of the billed-for services were medically necessary, finding no evidence that Mr. Brow required psychological care. In Dr. Elmore’s view, the self-referral consent and authorization form did not warrant referral for psychological evaluation, in that the conditions noted are commonly experienced for some months after a motor vehicle accident. He considered the three Beck instruments to be inappropriately used as diagnostic tests, rather than for research purposes or in long-term clinical treatment after a diagnosis has been made. And he considered any information derived from those instruments to be of no use for treatment purposes. As stated in his report, and repeated in various forms and contexts during his testimony at trial, Dr. Elmore saw no “psychological complaints of a significant functionally disabling degree of severity” to require any of the services rendered.
Dr. Baumgarten testified to the contrary that the self-referral consent and authorization form would! warrant psychological evaluation, considering information as to functional consequences “useful” but “not essential.”' In his view, the Beck instruments are “clearly diagnostic tests” that are frequently used before a diagnosis has been made, for example, to validate information provided by the patient during the relatively short interview or to “rule in or rule out” a diagnosis. He considered the information derived from the instruments to be helpful in making treatment decisions. Expressing his general view that *611 earlier treatment is better than later treatment, even without manifest functional consequences, he concluded from Dr. Seidman’s reports that Mr. Brow would benefit from psychological treatment.
The governing statute and regulations provide no standard or paradigm that allows the court to choose between the conflicting concepts of “medical necessity” offered by the qualified experts who testified at trial. In the absence of some standard or paradigm against which the court may assess the respective opinions of these experts, their conflicting opinions appear to do “no more than demonstrate a difference in professional medical judgment.” (See Strassberg v Connecticut Gen. Life Ins. Co., 182 AD2d 1055, 1057 [3d Dept 1992].)
There is no question that psychological services, including the administration of psychological tests, are compensable under the no-fault scheme. (See Valley Psychological v Liberty Mut. Ins. Co., 195 Misc 2d 540 [Albany City Ct 2002]; Yellin v Liberty Mut. Ins. Co., 192 Misc 2d 285 [Civ Ct, Queens County 2002]; Rombom v Interboro Mut. Indem. Ins. Co., 170 Misc 2d 846 [Civ Ct, Queens County 1996].) In particular, the Beck instruments are administered to “[assess] the psychological impact of [an] accident.” (DeJesus v Rafael, 2003 WL 21305358, *4, 2003 US Dist LEXIS 9488, *12 [SD NY, June 5, 2003].)
Indeed, psychological injury can qualify as “serious injury” within the meaning of Insurance Law § 5102 (d). (See Bissonette v Compo, 307 AD2d 673, 674 [3d Dept 2003]; Quaglio v Tomaselli, 99 AD2d 487, 488 [2d Dept 1984]; Bligh v Isaac, 2003 NY Slip Op 50821[U], *2 [App Term, 2d & 11th Jud Dists].) But courts will look for “objective medical evidence” of the injury. (See Bissonette v Compo, 307 AD2d at 674; see also Marshall v Yang, 2002 NY Slip Op 50576[U], *2 [App Term, 2d & 11th Jud Dists] [“objectively measured quantum of evidence”], quoting Sellitto v Casey, 268 AD2d 753, 755 [3d Dept 2000].) Presumably, psychological tests of the type administered in this case would qualify.
This court is aware of only two published decisions in which courts have ruled on the medical necessity of psychological services. In Medical Expertise v Trumbull Ins. Co. (196 Misc 2d 389 [Civ Ct, Queens County 2003]), the billed-for psychological services were almost identical to those that are the subject of this case, including referral based upon a “self referral consent and authorization form” and administration of the three Beck instruments (see id. at 390). The claim was denied, based upon *612 a peer review that was “critical of using diagnostic tests instead of personal interviews.” (Id. at 391.)
Judge Siegal found the conflicting éxpert testimony to be “equally credible.” (Id. at 394.) Ruling that the controlling questions were “could a psychologist hold an objective and reasonable belief that a tool used will further the patient’s diagnosis and treatment and whether that tool is warranted given the circumstances” (id. at 395), Judge Siegal concluded that the testing instruments “appear to be administered too soon after the motor vehicle accident and by the very nature of some of the questions, not appropriate, given the circumstances” (id.).. Other than noting that the instruments were administered “a mere two days” after the accident (see id. at 394), Judge Siegal did not elaborate. Although she concluded that the testing was not “medically necessary,” she concluded to the contrary with respect to the review of records, interview and therapy session, again without elaboration. (See id. at 395.)
The opinion in Pain Resource Ctr. v (Travelers Ins. Co. (185 Misc 2d 409 [Civ Ct, Queens County 2000]) does not fully describe the psychological services billed for, but they apparently included “several batteries of tests” (see id. at 410). Without extended discussion, Judge Goldstein concluded that the peer review expert’s “strenuous disagreement with the methods used by [the treating psychologist] for determining the patient’s mental status, as unnecessary, was more credible than the voluminous testing explained by the plaintiff,” and the “recommendation by [the peer review expert] to refer a patient with physical symptoms to a neurologist, prior to performing most of the tests following that for mental status, was more reasonable than that of’ the treating psychologist. (Id. at 411; see also Jocoy v Blue Cross Blue Shield of Cent. N.Y., 260 AD2d 777, 787 [3d Dept 1999] [upholding jury verdict that inpatient psychological treatment was not medically necessary, based in part on jury’s assessment of credibility of conflicting expert testimony].)
As indicated above, this court believes that determinations of medical necessity by assessment of the ‘[credibility” of conflicting expert testimony will, in most cases, - become a resolution of “a difference in professional medical judgment,” unless there is reference to generally accepted medical/professional practice. Medical insurance policies have defined “[m]edically [n]ecessary in terms of generally accepted medica) standards,” albeit as determined by the insurer. (See Wait v Metropolitan Life Ins. Co., 168 AD2d 867, 867-868 [3d Dept 1990]; see also Wachtel v *613 Metropolitan Life Ins. Co., 146 Misc 2d 670, 671 [App Term, 2d Dept 1990].) Exclusions in such policies for “experimental” or “investigative” procedures or treatments likewise have spoken in terms of “accepted medical protocol” (see Bradley v Empire Blue Cross & Blue Shield, 149 Misc 2d 20, 24 [Sup Ct, NY County 1990]), or “effectiveness . . . generally recognized” (see Zuckerberg v Blue Cross & Blue Shield of Greater N.Y., 108 AD2d 56, 61 [2d Dept 1985], affd 67 NY2d 688 [1986]). In at least one state, an insurance regulation defines “medically necessary” as, among other things, “[i]n accordance with generally accepted standards of medical practice.” (See Wis Admin Code Ins § 3.54 [3] [d] [3], quoted in Schroeder v Blue Cross & Blue Shield, United of Wis., 153 Wis 2d 165, 178 n 2, 450 NW2d 470, 475 n 2 [1989].)
New York courts explicitly or implicitly look to generally accepted practice in determining medical necessity under general medical insurance policies. (See Tudor v Metropolitan Life Ins. Co., 143 Misc 2d 180, 182 [Nassau Dist Ct 1989] [“generally accepted medical practice”]; Davidson v Aetna Life & Cas. Ins. Co., 101 Misc 2d 1, 3 [Sup Ct, NY County 1979] [sex-reassignment surgery determined to be necessary medical expense after “an extensive reading of applicable literature,” including “a standard of care manual for gender dysphoric patients”]; Mount Sinai Hosp. v Zorek, 50 Misc 2d 1037, 1042 [Civ Ct, NY County 1966] [“The Duncan regime is a recognized medical treatment for obesity . . . (chosen by) many reputable doctors”]; see also Hughes v Blue Cross of N. Cal., 215 Cal App 3d 832, 843, 263 Cal Rptr 850, 855 [1989] [“The jury could reasonably infer that (the insurer’s peer review doctor) employed a standard of medical necessity markedly at variance from that of the psychiatric community in California”]; Jacob v Blue Cross & Blue Shield of Or., 92 Or App 259, 262, 758 P2d 382, 383 [1988] [“accepted medical standards” provide an “objective basis for . . . determination that (therapies) were not medically necessary”].)
A standard for medical necessity based upon generally accepted medical/professional practice also recognizes the health care provider’s professional responsibility to the patient. The long-standing paradigm for a doctor’s responsibility is the “objective reasonably prudent doctor standard,” under which the doctor’s performance is “measured against the conduct of his or her own peers.” (See Nestorowich v Ricotta, 97 NY2d 393, 398 [2002]; see also Toth v Community Hosp. at Glen Cove, 22 *614 NY2d 255, 262 [1968] [“accepted community standards of practice”]; Sanabria v City of New York, 42 AD2d 615, 615 [2d Dept 1973] [“reasonably prudent physician”].) A similar standard would apply to psychologists. (See Gedon v Bry-Lin Hosps., 286 AD2d 892, 894 [4th Dept 2001].)
Admittedly, courts have rejected a “general acceptance” standard for medical necessity, at least in so far as “general acceptance” has been used to determine the admissibility at trial of scientific evidence under Frye v United States (293 F 1013, 1014 [DC Cir 1923] [“sufficiently established to have gained acceptance in the particular field in which it belongs”]). Those courts have considered the standard as potentially too restrictive when used to determine whether new or innovative procedures or treatments should be paid for under no-fault insurance schemes. (See Tagliati v Nationwide Ins. Co., 720 A2d 1051, 1054-1055 [Pa Super 1998]; Thermographic Diagnostics, Inc. v Allstate Ins. Co., 125 NJ 491, 510-511, 593 A2d 768, 779 [1991]; Sabatier v State Farm Mut. Auto. Ins. Co., 323 Md 232, 249, 592 A2d 1098, 1106 [1991].)
Those concerns may be particularly appropriate when mental health services are involved:
“Courts have been hardpressed ... to formulate a definitive standard of care against which to measure the conduct of mental health professionals. What passes as a legitimate form ;of therapy in one jurisdiction may be found unacceptable in the next . . . [There is a] large number of different and conflicting schools of therapy within the mental health profession itself. A profusion of new forms of treatment merely exacerbates the problem.” (Lawrence P. Hampton, Malpractice in Psychotherapy: Is there a Relevant Standard of Caret?, 35 Case W Res L Rev 251, 253 [1985].)
The New York Legislature and courts share the policy orientation that no-fault insureds should receive “full compensation for economic loss” (see Oberly v Bangs Ambulance, 96 NY2d 295, 298 [2001]) under the Comprehensive Motor Vehicle Insurance Reparations Act (see Insurance Law § 5101). But adoption of a “general acceptance” standard for medical necessity need not result in a diversion from ¡that orientation. The “general acceptance” standard as it would be applied to determine medical necessity in a no-fault case must be conceived differently than when it is applied to determine *615 the admissibility of scientific evidence in a criminal or civil trial, or when it is applied to determine the minimal level of professional competence to escape malpractice liability.
The focus of the inquiry into “generally accepted medical/ professional practice” should be on the practice, that is, the varied and dynamic interaction between the professional and patient in the office and examining room, when decisions about diagnostic tests and treatment are made in light of many complex factors, including the risk of exposure to malpractice liability and, yes, the cost of the test or treatment, the ability of the patient to pay, and the availability of insurance or third-party reimbursement. It is unrealistic to pretend that practitioners do not consider those factors, particularly when the very insurance scheme that requires “necessity” for reimbursement also limits recovery in the absence of “objective” evidence, including the nature and length of the treatment.
Like Judge Siegal, other courts, including this one, have attempted to articulate a definition, formula or test for when services should be deemed “medically necessary.” We find in the opinions “valid medical purpose” and “actual medical benefit” (Sunrise Med. Imaging v Liberty Mut. Ins. Co., 2001 NY Slip Op 40091 [U], *4-5 [Nassau Dist Ct]); “objective and reasonable belief that the tool will further the patient’s diagnosis and treatment” (Medical Expertise v Trumbull Ins. Co., 196 Misc 2d at 395); “more than merely convenient or useful” (Fifth Ave. Pain Control Ctr. v Allstate Ins. Co., 196 Misc 2d 801, 807 [Civ Ct, Queens County 2003]); “credible and reliable evidence” of “medical value” (Thermographic Diagnostics, Inc. v Allstate Ins. Co., 125 NJ at 512, 593 A2d at 780); “satisfactory proof . . . [of] efficacious material value of its own” (Sabatier v State Farm Mut. Auto. Ins. Co., 323 Md at 255, 592 A2d at 1109). But this court now finds those attempts ultimately unsatisfying.
These various formulations, although framed as definitions or tests, and presented as vehicles for assessing medical evidence and making a determination, mask unarticulated factors or reference to other sources of authority that are, in fact, controlling on the determination. Indeed, the authority of generally accepted medical/professional practice, including the factors evaluated and weighted in practice, appears to be required to give any useable content to the formulations. How else to determine “validity” and “reliability,” or medical “purpose,” “benefit,” “value,” or “efficacy”? How else to assess “reasonableness” or, for that matter, what is sufficiently “objective”? The content depends in a real way upon the context.
*616 Without reference to the authority; of generally accepted practice, the judge’s conclusion would appear to be yet another “professional medical judgment,” but one uninformed by the standards and values of the profession.; Neither insureds (and their health care providers) nor insurers 'benefit from uncertainties engendered by scores of judges retrospectively attempting to exercise medical/professional judgment. Most assuredly, uncertainties cannot advance the goals of the No-Fault Law, and there is no reason to suspect that the No-Fault Law was intended to change, rather than reflect, accepted professional practice.
In this trial, there was virtually no evidence as to generally accepted medical/professional practice with respect to a referral for psychological evaluation and subsequent diagnosis and treatment. Dr. Elmore did testify in a conclusory fashion that the testing instruments are “not normally used” in diagnosis and treatment, while Dr. Baumgarten testified conclusorily that the instruments are “frequently used.” Although perhaps of some inferential value on the question of generally accepted practice, neither statement directly addresses it.
For the purpose of determining medical necessity, it is expected that generally accepted practice will likely call for more than would be necessary to merely escape malpractice liability, and may well under some circumstances call for less than would render the results admissible at a trial. Generally accepted practice is that range of practice that the profession will follow in the diagnosis and treatment of patients in light of the standards and values that define its calling. For a “published test,” like those at issue in this case, evidence of such practice might readily be found in the material that accompanies the test and the writings in books and professional journals of the persons who designed the test and those, who have used it. Evidence might also be found in the “Guidelines of American Psychological Association for forensic assessment,” which Dr. Seidman cites in his “Psychological Evaluation” for the combination of tests chosen for Mr. Brow, or the American Psychiatric Press, which Dr. Seidman cites in his “medical necessity letter” for “appropriate uses of psychological testing and initial diagnostic interview.” J
The evidence at trial was insufficient to establish that the billed-for services were inconsistent with generally accepted professional practice, and, therefore, the evidence was insuf *617 ficient to carry defendant’s burden of proving that the services were not medically necessary.
Judgment is awarded to plaintiff for $1,181.63, together with statutory interest and attorney fees, plus costs.